JETT *v.* DALLAS INDEPENDENT SCHOOL DISTRICT

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FIFTH CIRCUIT

No. 87–2084.  Argued March 28, 1989—Decided June 22, 1989*

---

*Together with No. 88–214, *Dallas Independent School District* v. *Jett,*
also on certiorari to the same court.

702

*Frank Gilstrap* argued the cause for petitioner in No. 87–2084 and respondent in No. 87–214.   With him on the briefs were *Frank Hill* and *Shane Goetz.*

*Leonard J. Schwartz* argued the cause and filed a brief for respondent in No. 87–2084 and petitioner in No. 87–214.†

---

†Briefs of *amici curiae* urging reversal were filed for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers* and *Eric Schnapper;* and for the National Education Association by *Michael H. Gottesman* and *Jeremiah A. Collins.*

*Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch, Donald B. Ayer, Glen D. Nager,* and *Robert D. Sweeney, Jr.,* filed a brief for the International City Management Association et al. as *amici curiae* urging affirmance.

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, III, and IV, and an opinion with respect to Part II, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE KENNEDY join.

The questions before us in these cases are whether 42 U. S. C. § 1981 provides an independent federal cause of action for damages against local governmental entities, and whether that cause of action is broader than the damages remedy available under 42 U. S. C. § 1983, such that a municipality may be held liable for its employees' violations of § 1981 under a theory of *respondeat superior.*

I

Petitioner Norman Jett, a white male, was employed by respondent Dallas Independent School District (DISD) as a teacher, athletic director, and head football coach at South Oak Cliff High School (South Oak) until his reassignment to another DISD school in 1983. Petitioner was hired by the DISD in 1957, was assigned to assistant coaching duties at South Oak in 1962, and was promoted to athletic director and head football coach of South Oak in 1970. During petitioner's lengthy tenure at South Oak, the racial composition of the school changed from predominantly white to predominantly black. In 1975, the DISD assigned Dr. Fredrick Todd, a black, as principal of South Oak. Petitioner and Todd clashed repeatedly over school policies, and in particular over petitioner's handling of the school's football program. These conflicts came to a head following a November 19, 1982, football game between South Oak and the predominately white Plano High School. Todd objected to petitioner's comparison of the South Oak team with professional teams before the match, and to the fact that petitioner entered the officials' locker room after South Oak lost the game and told two black officials that he would never allow black officials to work another South Oak game. Todd also objected to petitioner's

statements, reported in a local newspaper, to the effect that the majority of South Oak players could not meet proposed National Collegiate Athletic Association academic requirements for collegiate athletes.

On March 15, 1983, Todd informed petitioner that he intended to recommend that petitioner be relieved of his duties as athletic director and head football coach at South Oak. On March 17, 1983, Todd sent a letter to John Kincaide, the director of athletics for DISD, recommending that petitioner be removed based on poor leadership and planning skills and petitioner's comportment before and after the Plano game. Petitioner subsequently met with John Santillo, director of personnel for DISD, who suggested that petitioner should transfer schools because any remaining professional relationship with Principal Todd had been shattered. Petitioner then met with Linus Wright, the superintendent of the DISD. At this meeting, petitioner informed Superintendent Wright that he believed that Todd's criticisms of his performance as head coach were unfounded and that in fact Todd was motivated by racial animus and wished to replace petitioner with a black head coach. Superintendent Wright suggested that the difficulties between Todd and petitioner might preclude petitioner from remaining in his coaching position at South Oak, but assured petitioner that another position in the DISD would be secured for him.

On March 25, 1983, Superintendent Wright met with Kincaide, Santillo, Todd, and two other DISD officials to determine whether petitioner should remain at South Oak. After the meeting, Superintendent Wright officially affirmed Todd's recommendation to remove petitioner from his duties as coach and athletic director at South Oak. Wright indicated that he felt compelled to follow the recommendation of the school principal. Soon after this meeting, petitioner was informed by Santillo that effective August 4, 1983, he was reassigned as a teacher at the DISD Business Magnet School, a position that did not include any coaching duties. Petitioner's at-

tendance and performance at the Business Magnet School were poor, and on May 5, 1983, Santillo wrote petitioner indicating that he was being placed on "unassigned personnel budget" and being reassigned to a temporary position in the DISD security department. Upon receiving Santillo's letter, petitioner filed this lawsuit in the District Court for the Northern District of Texas. The DISD subsequently offered petitioner a position as a teacher and freshman football and track coach at Jefferson High School. Petitioner did not accept this assignment, and on August 19, 1983, he sent his formal letter of resignation to the DISD.

Petitioner brought this action against the DISD and Principal Todd in his personal and official capacities, under 42 U. S. C. §§ 1981 and 1983, alleging due process, First Amendment, and equal protection violations. Petitioner's due process claim alleged that he had a constitutionally protected property interest in his coaching position at South Oak, of which he was deprived without due process of law. Petitioner's First Amendment claim was based on the allegation that his removal and subsequent transfer were actions taken in retaliation for his statements to the press regarding the sports program at South Oak. His equal protection and § 1981 causes of action were based on the allegation that his removal from the athletic director and head coaching positions at South Oak was motivated by the fact that he was white, and that Principal Todd, and through him the DISD, were responsible for the racially discriminatory diminution in his employment status. Petitioner also claimed that his resignation was in fact the product of racial harassment and retaliation for the exercise of his First Amendment rights and thus amounted to a constructive discharge. These claims were tried to a jury, which found for petitioner on all counts. The jury awarded petitioner $650,000 against the DISD, $150,000 against Principal Todd and the DISD jointly and severally, and $50,000 in punitive damages against Todd in his personal capacity.

On motion for judgment notwithstanding the verdict, the defendants argued that liability against the DISD was improper because there was no showing that petitioner's injuries were sustained pursuant to a policy or custom of the school district. App. to Pet. for Cert. in No. 87-2084, p. 46A. The District Court rejected this argument, finding that the DISD Board of Trustees had delegated final and unreviewable authority to Superintendent Wright to reassign personnel as he saw fit. *Id.*, at 47A. In any event, the trial court found that petitioner's claim of racial discrimination was cognizable under § 1981 as well as § 1983, and indicated that "liability is permitted on solely a basis of *respondeat superior* when the claim is one of racial discrimination under § 1981." *Ibid.* The District Court set aside the punitive damages award against Principal Todd as unsupported by the evidence, found the damages award against the DISD excessive and ordered a remittitur of $200,000, but otherwise denied the defendants' motions for judgment n. o. v. and a new trial and upheld the jury's verdict in all respects. *Id.*, at 62A–63A. Principal Todd has reached a settlement with petitioner and is no longer a party to this action. *Id.*, at 82A–84A.

On appeal, the Court of Appeals for the Fifth Circuit reversed in part and remanded. 798 F. 2d 748 (1986). Initially, the court found that petitioner had no constitutionally protected property interest "in the intangible, noneconomic benefits of his assignment as coach." *Id.*, at 754. Since petitioner had received both his teacher's and coach's salary after his reassignment, the change in duties did not deprive him of any state law entitlement protected by the Due Process Clause. The Court of Appeals also set aside the jury's finding that petitioner was constructively discharged from his teaching position within the DISD. The court found the evidence insufficient to sustain the claim that petitioner's loss of coaching duties and subsequent offer of reassignment to a lesser coaching position were so humiliating or unpleasant that a reasonable employee would have felt compelled to re-

sign. *Id.*, at 754–756. While finding the question "very close," the Court of Appeals concluded that there was sufficient evidence from which a reasonable jury could conclude that Principal Todd's recommendation that petitioner be transferred from his coaching duties at South Oak was motivated by impermissible racial animus. The court noted that Todd had replaced petitioner with a black coach, that there had been racial overtones in the tension between Todd and petitioner before the Plano game, and that Todd's explanation of his unsatisfactory rating of petitioner was questionable and was not supported by the testimony of other DISD officials who spoke of petitioner's performance in laudatory terms. *Id.*, at 756–757. The court also affirmed the jury's finding that Todd's recommendation that petitioner be relieved of his coaching duties was motivated in substantial part by petitioner's protected statements to the press concerning the academic standing of athletes at South Oak. These remarks addressed matters of public concern, and Todd admitted that they were a substantial consideration in his decision to recommend that petitioner be relieved of his coaching duties.

The Court of Appeals then turned to the DISD's claim that there was insufficient evidence to support a finding of municipal liability under 42 U. S. C. § 1983. The Court of Appeals found that the District Court's instructions as to the school district's liability were deficient in two respects. First, the District Court's instructions did not make clear that the school district could be held liable for the actions of Principal Todd or Superintendent Wright only if those officials were delegated policymaking authority by the school district or acted pursuant to a well settled custom that represented official policy. Second, even if Superintendent Wright could be considered a policymaker for purposes of the transfer of school district personnel, the jury made no finding that Superintendent Wright's decision to transfer petitioner was

either improperly motivated or consciously indifferent to the improper motivations of Principal Todd. *Id.*, at 759–760.

The Court of Appeals also rejected the District Court's conclusion that the DISD's liability for Principal Todd's actions could be predicated on a theory of *respondeat superior* under § 1981. The court noted that in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), this Court held that Congress did not intend municipalities to be subject to vicarious liability for the federal constitutional or statutory violations of their employees. The Court of Appeals reasoned that "[t]o impose such vicarious liability for only certain wrongs based on section 1981 apparently would contravene the congressional intent behind section 1983." 798 F. 2d, at 762.

The Court of Appeals published a second opinion in rejecting petitioner's suggestion for rehearing en banc in which the panel gave further explanation of its holding that *respondeat superior* liability against local governmental entities was unavailable under § 1981. 837 F. 2d 1244 (1988). The Court of Appeals noted that our decision in *Monell* rested in part on the conclusion that "'creation of a federal law of *respondeat superior* would have raised all the constitutional problems'" associated with the Sherman amendment which was rejected by the framers of § 1983. 837 F. 2d, at 1247, quoting *Monell*, *supra*, at 693.

Because the Court of Appeals' conclusion that local governmental bodies cannot be held liable under a theory of *respondeat superior* for their employees' violations of the rights guaranteed by § 1981 conflicts with the decisions of other Courts of Appeals, see, *e. g.*, *Springer* v. *Seamen*, 821 F. 2d 871, 880–881 (CA1 1987); *Leonard* v. *Frankfort Electric and Water Plant Bd.*, 752 F. 2d 189, 194, n. 9 (CA6 1985) (dictum), we granted Norman Jett's petition for certiorari in No. 87–2084. 488 U. S. 940 (1988). We also granted the DISD's cross-petition for certiorari in No. 88–214, *ibid.*, to clarify the application of our decisions in *St. Louis* v. *Pra-*

*protnik,* 485 U. S. 112 (1988) (plurality opinion), and *Pembaur* v. *Cincinnati,* 475 U. S. 469 (1986) (plurality opinion), to the school district's potential liability for the discriminatory actions of Principal Todd.

We note that at no stage in the proceedings has the school district raised the contention that the substantive scope of the "right . . . to make . . . contracts" protected by § 1981 does not reach the injury suffered by petitioner here. See *Patterson* v. *McLean Credit Union, ante,* at 176–177. Instead, the school district has argued that the limitations on municipal liability under § 1983 are applicable to violations of the rights protected by § 1981. Because petitioner has obtained a jury verdict to the effect that Dr. Todd violated his rights under § 1981, and the school district has never contested the judgment below on the ground that § 1981 does not reach petitioner's employment injury, we assume for purposes of these cases, without deciding, that petitioner's rights under § 1981 have been violated by his removal and reassignment. See *Canton* v. *Harris,* 489 U. S. 378, 388–389, n. 8 (1989); *United States* v. *Leon,* 468 U. S. 897, 905 (1984). See also this Court's Rule 21.1(a).

II

Title 42 U. S. C. § 1981, as amended, provides that:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other."

In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981. While petitioner concedes that the text

of the 1866 Act itself is completely silent on this score, see Brief for Petitioner 26, petitioner contends that a civil remedy was nonetheless intended for the violation of the rights contained in § 1 of the 1866 Act. Petitioner argues that Congress wished to adopt the prevailing approach to municipal liability to effectuate this damages remedy, which was *respondeat superior*. Petitioner concludes that with this federal damages remedy in place in 1866, it was not the intent of the 42d Congress, which passed present day § 1983, to narrow the more sweeping remedy against local governments which Congress had created five years earlier. Since "repeals by implication are not favored," *id.*, at 15 (citations omitted), petitioner concludes that § 1981 must provide an independent cause of action for racial discrimination against local governmental entities, and that this broader remedy is unaffected by the constraints on municipal liability announced in *Monell*. In the alternative, petitioner argues that even if § 1981 does not create an express cause of action for damages against local governmental entities, 42 U. S. C. § 1988 invites this Court to craft a remedy by looking to common law principles, which again point to a rule of *respondeat superior*. Brief for Petitioner 27–29. To examine these contentions, we must consider the text and history of both the Civil Rights Act of 1866 and the Civil Rights Act of 1871, the precursors of §§ 1981 and 1983 respectively.

JUSTICE BRENNAN's dissent errs in asserting that we have strayed from the question upon which we granted certiorari. See *post*, at 739–740. Jett's petition for certiorari asks us to decide "[w]hether a public employee who claims job discrimination on the basis of race must show that the discrimination resulted from official 'policy or custom' in order to recover under 42 U. S. C. § 1981." Pet. for Cert. in No. 87–2084, p. i. In answering this question, the lower court looked to the relationship between §§ 1981 and 1983, and refused to differentiate "between sections 1981 and 1983 with respect to municipal *respondeat superior* liability." 837 F. 2d, at 1247. In both his petition for certiorari and his brief on the merits

in this Court, petitioner Jett took issue with the Court of Appeals' conclusion that the express damages remedy under § 1983 militated against the creation or implication of a broader damages remedy under § 1981. See Pet. for Cert. in No. 87–2084, pp. 14–16; Brief for Petitioner 14–25. Moreover, petitioner concedes that "private causes of action under Sections 1981 and 1982 do not arise from the express language of those statutes," Brief for Petitioner 27, and asks this Court to "look to state law or to fashion a single federal rule," of municipal damages liability under § 1981. *Id.*, at 28–29 (footnote omitted). We think it obvious that the question whether a federal damages remedy broader than that provided by § 1983 should be implied from § 1981 is fairly included in the question upon which we granted certiorari.

Equally implausible is JUSTICE BRENNAN's suggestion that we have somehow unwittingly answered this question in the past. See *post*, at 741. Most of the cases cited by the dissent involved private conduct, and thus quite obviously could not have considered the propriety of judicial implication of a federal damages remedy under § 1981 in the state action context we address here. The only two cases cited by JUSTICE BRENNAN which involved state actors, *Takahashi* v. *Fish and Game Comm'n*, 334 U. S. 410 (1948), and *Hurd* v. *Hodge*, 334 U. S. 24 (1948), are completely inapposite. See *post*, at 745. *Takahashi* involved a mandamus action filed in state court, and thus understandably had nothing to say about federal damages remedies against state actors under § 1981. *Hurd* also involved only injunctive relief, and could not have considered the relationship of § 1981 to § 1983, since the latter statute did not apply to the District of Columbia at the time of our decision in that case. See *District of Columbia* v. *Carter*, 409 U. S. 418 (1973).

## A

On December 18, 1865, the Secretary of State certified that the Thirteenth Amendment had been ratified and become part of the Constitution. Less than three weeks later,

Senator Lyman Trumbull, Chairman of the Senate Judiciary Committee, introduced S. 61, which was to become the Civil Rights Act of 1866. See Cong. Globe, 39th Cong., 1st Sess., 129 (1866). The bill had eight sections as introduced, the first three of which are relevant to our inquiry here. Section 1, as introduced to the Senate by Trumbull, provided:

> "That there shall be no discrimination in civil rights or immunities among the inhabitants of any State or Territory of the United States on account of race, color, or previous condition of slavery; but the inhabitants of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for a crime whereof the party shall have been duly convicted, shall have the same right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding." *Id.*, at 474.

On January 29, 1866, Senator Trumbull took the floor to describe S. 61 to his colleagues. Trumbull indicated that "the first section will amount to nothing more than the declaration in the Constitution itself unless we have the machinery to carry it into effect." *Id.*, at 475. The Senator then alluded to the second section of the bill which provided:

> "That any person who under color of any law, statute, ordinance, regulation, or custom shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, . . .

or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court." *Ibid.*

Senator Trumbull told the Senate: "This is the valuable section of the bill so far as protecting the rights of freedmen is concerned." *Ibid.* This section would allow for criminal prosecution of those who denied the freedman the rights protected by § 1, and Trumbull felt, in retrospect somewhat naively, that, "it will only be necessary to go into the late slaveholding States and subject to fine and imprisonment one or two in a State, and the most prominent ones I should hope at that, to break up this whole business." *Ibid.*

Trumbull then described the third section of the bill, which, as later enacted, provided in pertinent part:

"That the district courts of the United States, within their respective districts, shall have, exclusively of the courts of the several States, cognizance of all crimes and offenses committed against the provisions of this act, and also, concurrently with the circuit courts of the United States, of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act; and if any suit or prosecution, civil or criminal, has been or shall be commenced in any State court, against any such person, for any cause whatsoever . . . such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain cases,' approved March three, eighteen hundred and sixty three, and all acts amendatory thereof." 14 Stat. 27.

Trumbull described this section as "giving to the courts of the United States jurisdiction over all persons committing offenses against the provisions of this act, and also over the cases of persons who are discriminated against by State laws or customs." Cong. Globe, 39th Cong., 1st Sess., 475 (1866). Much of the debate in both the Senate and the House over the 1866 Act was taken up with the meaning of the terms "civil rights or immunities" contained in the first sentence of §1 of the bill as introduced in the Senate. The phrase remained in the bill throughout the Senate's consideration of S. 61, but was stricken by amendment in the House shortly before that body passed the bill.

Discussion of §2 of the bill focused on both the propriety and constitutionality of subjecting state officers to criminal punishment for effectuating discriminatory state laws. Opponents of the bill consistently referred to criminal punishment and fines being levied against state judges and other state officers for the enforcement of state laws in conflict with §1. See *id.*, at 475, 499, 500 (Sen. Cowan); *id.*, at 598 (Sen. Davis); *id.*, at 1121 (Rep. Rogers); *id.*, at 1154 (Rep. Eldridge). They never intimated that they understood any part of the bill to create a federal damages remedy against state officers or the political subdivisions of the States.

Debate concerning §3 focused on the right of removal of civil and criminal proceedings commenced in state court. Senator Howard, an opponent, engaged in a section by section criticism of the bill after its introduction by Trumbull. As to §3 he gave numerous examples of his perception of its operation. All of these involved removal of actions from state court, and none alluded to original federal jurisdiction except in the case of the exclusive criminal jurisdiction expressly provided for. *Id.*, at 479 ("All such cases will be subject to be removed into the Federal courts"); see also *id.*, at 598 (Sen. Davis) ("Section three provides that all suits brought in State courts that come within the purview of the previous sections may be removed into the Federal courts").

On February 2, 1866, the bill passed the Senate by a vote of 33 to 12 and was sent to the House. *Id.*, at 606–607.

Representative Wilson of Iowa, Chairman of the House Judiciary Committee, introduced S. 61 in the House on March 1, 1866. Of § 1 of the bill, he said:

> "Mr. Speaker, I think I may safely affirm that this bill, so far as it declares the equality of all citizens in the enjoyment of civil rights and immunities merely affirms existing law. We are following the Constitution. . . . It is not the object of this bill to establish new rights, but to protect and enforce those which already belong to every citizen." *Id.*, at 1117.

As did Trumbull in the Senate, Wilson immediately alluded to § 2, the criminal provision, as the main enforcement mechanism of the bill. "In order to accomplish this end, it is necessary to fortify the declaratory portions of this bill with sanctions as will render it effective." *Id.*, at 1118.

The only discussion of a civil remedy in the House debates surrounding the 1866 Act came in response to Representative Bingham's proposal to send the bill back to the House Judiciary Committee with instructions "to strike out all parts of said bill which are penal and which authorize criminal proceedings, and in lieu thereof to give all citizens of the United States injured by denial or violation of any of the other rights secured or protected by said act, an action in the United States courts, with double costs in all cases of emergency, without regard to the amount of damages." *Id.*, at 1266, 1291. Bingham was opposed to the civil rights bill strictly on the grounds that it exceeded the constitutional power of the Federal Government. As to States "sustaining their full constitutional relation to the Government of the United States," Bingham, along with several other Republicans, doubted the power of the Federal Government to interfere with the reserved powers of the States to define property and other rights. *Id.*, at 1292. While Bingham realized that the same constitutional objections applied to his proposal

for modification of the bill, he felt that these would make the bill "less oppressive, and therefore less objectionable." *Id.*, at 1291.

Representative Wilson responded to his Republican colleague's proposal. Wilson pointed out that there was no difference in constitutional principle "between saying that the citizen shall be protected by the legislative power of the United States in his rights by civil remedy and declaring that he shall be protected by penal enactments against those who interfere with his rights." *Id.*, at 1295. Wilson did however see a difference in the effectiveness of the two remedies. He stated:

> "This bill proposes that the humblest citizen shall have full and ample protection at the cost of the Government, whose duty it is to protect him. The [Bingham] amendment . . . recognizes the principle involved, but it says that the citizen despoiled of his rights, instead of being properly protected by the Government, must press his own way through the courts and pay the bills attendant thereon. . . . The highest obligation which the Government owes to the citizen in return for the allegiance exacted of him is to secure him in the protection of his rights. Under the amendment of the gentleman the citizen can only receive that protection in the form of a few dollars in the way of damages, if he shall be so fortunate as to recover a verdict against a solvent wrongdoer. This is called protection. This is what we are asked to do in the way of enforcing the bill of rights. Dollars are weighed against the right of life, liberty and property." *Ibid.*

Bingham's proposal was thereafter defeated by a vote of 113 to 37. *Id.*, at 1296. The Senate bill was subsequently carried in the House, after the removal of the "civil rights and immunities" language in § 1, and an amendment adding a ninth section to the bill providing for a final appeal to the Supreme Court in cases arising under the Act. *Id.*, at 1366–

1367. On March 15, 1866, the Senate concurred in the House amendments without a record vote, see *id.*, at 1413–1416, and the bill was sent to the President.

After holding the bill for a full 10 days, President Johnson vetoed the bill and returned it to the Senate with his objections. The President's criticisms of §§ 2 and 3 of the bill, and Senator Trumbull's responses thereto, are particularly illuminating. As to § 2, the President declared that it was designed to counteract discriminatory state legislation, "by imposing fine and imprisonment upon the legislators who may pass such . . . laws." *Id.*, at 1680. As to the third section, the President indicated that it would vest exclusive federal jurisdiction over all civil and criminal cases where the rights guaranteed in § 1 were affected. *Ibid.*

Trumbull took issue with both statements. As to the charge that § 2 would result in the criminal prosecution of state legislators, Trumbull replied:

> "Who is to be punished? Is the law to be punished? Are the men who make the law to be punished? Is that the language of the bill? Not at all. If any person, 'under color of any law,' shall subject another to the deprivation of a right to which he is entitled, he is to be punished. Who? The person who, under the color of the law, does the act, not the men who made the law. In some communities in the South a custom prevails by which different punishment is inflicted upon the blacks from that meted out to whites for the same offense. Does this section propose to punish the community where the custom prevails? Or is it to punish the person who, under color of the custom, deprives the party of his right? It is a manifest perversion of the meaning of the section to assert anything else." *Id.*, at 1758.

Trumbull also answered the President's charge that the third section of the bill created original federal jurisdiction in all cases where a freedman was involved in a state court proceeding. He stated:

"So in reference to this third section, the jurisdiction is given to the Federal courts of a case affecting the person that is discriminated against. Now, he is not necessarily discriminated against, because there may be a custom in the community discriminating against him, nor because a Legislature may have passed a statute discriminating against him; that statute is of no validity if it comes in conflict with a statute of the United States; and it is not to be presumed that any judge of a State court would hold that a statute of a State discriminating against a person on account of color was valid when there was a statute of the United States with which it was in direct conflict, and the case would not therefore rise in which a party was discriminated against until it was tested, and then if the discrimination was held valid he would have a right to remove it to a Federal court." *Id.*, at 1759.

Senator Trumbull then went on to indicate that "[i]f it be necessary in order to protect the freedman in his rights that he should have authority to go into the Federal courts in all cases where a custom [of discrimination] prevails in a State . . . I think we have the authority to confer that jurisdiction under the second clause of the constitutional amendment." *Ibid.* Two days later, on April 6, 1866, the Senate overrode the President's veto by a vote of 33 to 15. *Id.*, at 1809. On April 9, 1866, the House received both the bill and the President's veto message which were read on the floor. *Id.*, at 1857–1860. The House then promptly overrode the President's veto by a vote of 122 to 41, *id.*, at 1861, and the Civil Rights Act of 1866 became law.

Several points relevant to our present inquiry emerge from the history surrounding the adoption of the Civil Rights Act of 1866. First, nowhere did the Act provide for an express damages remedy for violation of the provisions of § 1. See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 414, n. 13 (1968) (noting "[t]hat 42 U. S. C. § 1982 is couched in declara-

tory terms and provides no explicit method of enforcement"); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 238 (1969); *Cannon* v. *University of Chicago*, 441 U. S. 677, 690, n. 12 (1979); *id.*, at 728 (WHITE, J., dissenting). Second, no original federal jurisdiction was created by the 1866 Act which could support a federal damages remedy against state actors. See *Allen* v. *McCurry*, 449 U. S. 90, 99, n. 14 (1980) (§ 3 of the 1866 Act embodied remedy of "postjudgment removal for state-court defendants whose civil rights were threatened"); *Georgia* v. *Rachel*, 384 U. S. 780, 788–789 (1966); *Strauder* v. *West Virginia*, 100 U. S. 303, 311–312 (1880). Finally, the penal provision, the only provision explicitly directed at state officials, was, in Senator Trumbull's words, designed to punish the "person who, under the color of the law, does the act," not "the community where the custom prevails." Cong. Globe, 39th Cong., 1st Sess., 1758 (1866).

Two events subsequent to the passage of the 1866 Act bear on the relationship between §§ 1981 and 1983. First, on June 13, 1866, just over two months after the passage of the 1866 Act, a joint resolution was passed sending the Fourteenth Amendment to the States for ratification. As we have noted in the past, the first section of the 1866 Act "constituted an initial blueprint of the Fourteenth Amendment." *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 389 (1982). Many of the Members of the 39th Congress viewed § 1 of the Fourteenth Amendment as "constitutionalizing" and expanding the protections of the 1866 Act and viewed what became § 5 of the Amendment as laying to rest doubts shared by both sides of the aisle concerning the constitutionality of that measure. See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., 2465 (1866) (Rep. Thayer) ("As I understand it, it is but incorporating in the Constitution of the United States the principle of the civil rights bill which has lately become a law"); *id.*, at 2498 (Rep. Broomall); *id.*, at 2459 (Rep. Stevens); *id.*, at 2461 (Rep. Finck); *id.*, at 2467

(Rep. Boyer). See also *Hurd* v. *Hodge,* 334 U. S., at 32 ("[A]s the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land") (footnote omitted).

Second, the 41st Congress reenacted the substance of the 1866 Act in a Fourteenth Amendment statute, the Enforcement Act of 1870. 16 Stat. 144. Section 16 of the 1870 Act was modeled after § 1 of the 1866 Act. Section 17 reenacted with some modification the criminal provisions of § 2 of the earlier civil rights law, and § 18 of the 1870 Act provided that the entire 1866 Act was reenacted. See *Civil Rights Cases,* 109 U. S. 3, 16–17 (1883). We have thus recognized that present day 42 U. S. C. § 1981 is both a Thirteenth and a Fourteenth Amendment statute. *Runyon* v. *McCrary,* 427 U. S. 160, 168–169, n. 8 (1976); *id.,* at 190 (STEVENS, J., concurring); *General Building Contractors, supra,* at 383–386.

## B

What is now § 1983 was enacted as § 1 of "An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States and For other Purposes," Act of April 20, 1871, ch. 22, 17 Stat. 13. The immediate impetus for the bill was evidence of widespread acts of violence perpetrated against the freedmen and loyal white citizens by groups such as the Ku Klux Klan. On March 23, 1871, President Grant sent a message to Congress indicating that the Klan's reign of terror in the Southern States had "render[ed] life and property insecure," and that "the power to correct these evils [was] beyond the control of State authorities." Cong. Globe, 42d Cong., 1st Sess., 244 (1871). A special joint committee consisting of 10 distinguished Republicans, 5 from each House of Congress, was formed in response to President Grant's call for legislation, and drafted the bill that became what is now known as the Ku Klux Act. As enacted,

§§ 2 through 6 of the bill specifically addressed the problem of the private acts of violence perpetrated by groups like the Klan.

Unlike the rest of the bill, § 1 was not specifically addressed to the activities of the Klan. As passed by the 42d Congress, § 1 provided in full:

> "That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases." 17 Stat. 13.

Three points are immediately clear from the face of the Act itself. First, unlike any portion of the 1866 Act, this statute explicitly ordained that any "person" acting under color of state law or custom who was responsible for a deprivation of constitutional rights would "be liable to the party injured in any action at law." Thus, "the 1871 Act was designed to expose state and local officials to a new form of liability." *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 259 (1981). Second, the 1871 Act explicitly provided original federal jurisdiction for prosecution of these civil actions against state

actors. See *Will* v. *Michigan Dept. of State Police, ante*, at 66 ("[A] principle purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims"); accord, *Mitchum* v. *Foster*, 407 U. S. 225, 239 (1972). Third, the first section of the 1871 Act was explicitly modeled on § 2 of the 1866 Act, and was seen by both opponents and proponents as amending and enhancing the protections of the 1866 Act by providing a new civil remedy for its enforcement against state actors. See *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 610–611, n. 25 (1979) ("Section 1 of the [1871] Act generated the least concern; it merely added civil remedies to the criminal penalties imposed by the 1866 Civil Rights Act"); *Monroe* v. *Pape*, 365 U. S. 167, 185 (1961); *Mitchum, supra*, at 238.

Even a cursory glance at the House and Senate debates on the 1871 Act makes these three points clear. In introducing the bill to the House, Representative Shellabarger, who served on the joint committee which drafted the bill, stated:

> "The model for it will be found in the second section of the act of April 9, 1866, known as the 'civil rights act.' That section provides a criminal proceeding in identically the same case as this one provides a civil remedy for, except that the deprivation under color of State law must, under the civil rights act, have been on account of race, color or former slavery." Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871).

Representative Shellabarger added that § 1 provided a civil remedy "on the same state of facts" as § 2 of the Civil Rights Act of 1866. *Ibid.* Obviously Representative Shellabarger's introduction of § 1 of the bill to his colleagues would have been altogether different if he had been of the view that the 39th Congress, of which he had been a Member, had *already* created a *broader* federal damages remedy against state actors in 1866. The view that § 1 of the 1871 Act was an amendment of or supplement to the 1866 Act designed to create a new civil remedy against state actors was

echoed throughout the debates in the House. See *id.*, at 461 (Rep. Coburn); *id.*, at App. 312–313 (Rep. Burchard). Opponents of § 1 operated on this same understanding. See *id.*, at 429 (Rep. McHenry) ("The first section of the bill is intended as an amendment of the civil rights act"); *id.*, at 365 (Rep. Arthur).

Both proponents and opponents in the House viewed § 1 as working an *expansion* of federal jurisdiction. Supporters continually referred to the failure of the state courts to enforce federal law designed for the protection of the freedman, and saw § 1 as remedying this situation by interposing the federal courts between the State and citizens of the United States. See *id.*, at 376 (Rep. Lowe) ("The case has arisen . . . when the Federal Government must resort to its own agencies to carry its own authority into execution. Hence this bill throws open the doors of the United States courts to those whose rights under the Constitution are denied or impaired"). Opponents recognized the expansion of original jurisdiction and railed against it on policy and constitutional grounds. See *id.*, at 429 (Rep. McHenry) ("The first section of the bill . . . vests in the Federal courts jurisdiction to determine the individual rights of citizens of the same State; a jurisdiction which of right belongs only to the State tribunals"); *id.*, at App. 50 (Rep. Kerr); *id.*, at 365–366 (Rep. Authur); *id.*, at 373 (Rep. Archer).

The Senate debates on § 1 of the 1871 Act are of a similar tenor. Senator Edmunds, Chairman of the Senate Judiciary Committee, and one of the members of the joint committee which drafted the bill, introduced § 1 to the Senate in the following terms:

> "The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the civil rights bill, which have

since become a part of the Constitution." *Id.*, at 568, quoted in *Monroe* v. *Pape, supra,* at 171.

Again Senators addressed § 1 of the Act as creating a new civil remedy and expanding federal jurisdiction to accommodate it in terms incompatible with the supposition that the 1866 Act had already created such a cause of action against state actors. See Cong. Globe, 42d Cong., 1st Sess., 653 (1871) (Sen. Osborn) ("I believe the true remedy lies chiefly in the United States district and circuit courts. If the State courts had proven themselves competent . . . we should not have been called upon to legislate upon this subject at all. But they have not done so"); *id.,* at App. 216 (Sen. Thurman) ("Its whole effect is to give to the Federal Judiciary that which does not belong to it — a jurisdiction that may be constitutionally conferred upon it, I grant, but that has never yet been conferred upon it"); see also *id.,* at 501 (Sen. Frelinghuysen).

The final aspect of the history behind the adoption of present day § 1983 relevant to the question before us is the rejection by the 42d Congress of the Sherman amendment, which specifically proposed the imposition of a form of vicarious liability on municipal governments. This history was thoroughly canvassed in the Court's opinion in *Monell,* and only its broadest outlines need be traced here. Immediately prior to the vote on the bill in the Senate, Senator Sherman introduced an amendment which would have constituted a seventh section of the 1871 Act. Cong. Globe, 42d Cong., 1st Sess., 663 (1871). In its original form, the amendment did not place liability on municipal corporations *per se,* but instead rendered the inhabitants of a municipality liable in civil damages for injury inflicted to persons or property in violation of federal constitutional and statutory guarantees "by any persons riotously and tumultuously assembled together." The initial Sherman amendment was passed by the Senate, but was rejected by the House and became the subject of a conference committee. The committee draft of the Sherman

amendment explicitly provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, "the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense." *Id.*, at 755. Judgments in such actions were to run directly against the municipal corporation, and were to be enforceable through a "lien . . . upon all moneys in the treasury of such county, city, or parish, as upon the other property thereof." *Ibid.*

Opposition to the amendment in this form was vehement, and ran across party lines, extending to many Republicans who had voted for § 1 of the 1871 Act, as well as earlier Reconstruction legislation, including the Civil Rights Act of 1866. See *id.*, at 758 (Sen. Trumbull); *id.*, at 798–799 (Rep. Farnsworth).

The Sherman amendment was regarded as imposing a new and theretofore untested form of liability on municipal governments. As Representative Blair put it:

> "The proposition known as the Sherman amendment — and to that I shall confine myself in the remarks which I may address to the House — is entirely new. It is altogether without a precedent in this country. Congress has never asserted or attempted to assert, so far as I know, any such authority. That amendment claims the power in the General Government to go into the States of this Union and lay such obligations as it may please upon the municipalities, which are the creations of the States alone." *Id.*, at 795 (Rep. Blair), partially quoted in *Monell*, 436 U. S., at 673–674.

See also Cong. Globe, 42d Cong., 1st Sess., 758 (1871) (Sen. Trumbull) (referring to the conference committee version of the Sherman amendment as "asserting principles never before exercised, on the part of the United States at any rate").

The strong adverse reaction to the Sherman amendment, and continued references to its complete novelty in the law of

the United States, make it difficult to entertain petitioner's contention that the 1866 Act had already created a form of vicarious liability against municipal governments. Equally important is the basis for opposition. As we noted in *Monell*, a large number of those who objected to the principle of vicarious liability embodied in the Sherman amendment were of the view that Congress did not have the power to assign the duty to enforce federal law to state instrumentalities by making them liable for the constitutional violations of others. See *Monell, supra,* at 674–679. As Representative Farnsworth put it: "The Supreme Court of the United States has decided repeatedly that Congress can impose no duty on a State officer." Cong. Globe, 42d Cong., 1st Sess., 799 (1871). Three decisions of this Court lent direct support to the constitutional arguments of the opponents, see *Collector v. Day,* 11 Wall. 113 (1871); *Kentucky v. Dennison,* 24 How. 66 (1861), and *Prigg v. Pennsylvania,* 16 Pet. 539 (1842). *Day* and *Prigg* were repeatedly cited in the House debates on the Sherman amendment. See *Monell, supra,* at 673–683, and n. 30. In *Prigg,* perhaps the most famous and most oft cited of this line of cases, Justice Story wrote for the Court that Congress could not constitutionally "insist that the states are bound to provide means to carry into effect the duties of the national government." *Prigg, supra,* at 616. In *Monell,* we concluded that it was this constitutional objection which was the driving force behind the eventual rejection of the Sherman amendment. *Monell, supra,* at 676.

Although the debate surrounding the constitutional principles established in *Prigg, Dennison,* and *Day* occurred in the context of the Sherman amendment and not § 1 of the 1871 Act, in *Monell* we found it quite inconceivable that the same legislators who opposed vicarious liability on constitutional grounds in the Sherman amendment debates would have silently adopted the same principle in § 1. Because the "creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with

the obligation to keep the peace" embodied in the Sherman amendment, we held that the existence of the constitutional background of *Prigg, Dennison,* and *Day* "compell[ed] the conclusion that Congress did not intend municipalities to be held liable [under § 1] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell, supra,* at 691.

Both *Prigg* and *Dennison* were on the books when the 39th Congress enacted § 1 of the 1866 Act. Supporters of the 1866 Act were clearly aware of *Prigg,* and cited the case for the proposition that the Federal Government could use its *own* instrumentalities to effectuate its laws. See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 1294 (1871) (Rep. Wilson). There was, however, no suggestion in the debates surrounding the 1866 Act that the statute violated *Prigg*'s complementary holding that federal duties could not be imposed on state instrumentalities by rendering them vicariously liability for the violations of others. Just as it affected our interpretation of § 1 of the 1871 Act in *Monell,* we think the complete silence on this score in the face of a constitutional background known to those who enacted the 1866 Act militates against imputing to Congress an intent to silently impose vicarious liability on municipalities under the earlier statute. Cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 376 (1951).

As originally enacted, the text of § 1983 referred only to the deprivation "of any rights, privileges, or immunities secured by the Constitution of the United States." In 1874, Congress enacted the Revised Statutes of the United States. The words "and laws" were added to the remedial provision of § 1 of the 1871 Act which became Rev. Stat. § 1979. At the same time, the jurisdictional grant in § 1 of the 1871 Act was split into two different provisions, Rev. Stat. § 563(12), granting jurisdiction to the district courts of the United States to redress deprivations under color of state law of any right secured by the Constitution or "by any law of the United States," and Rev. Stat. § 629(16), granting jurisdic-

tion to the old circuit courts for any action alleging depriva-tion under state authority of any right secured "by any law providing for equal rights." In 1911, Congress abolished the circuit courts of the United States and the Code's definition of the jurisdiction of the district courts was taken from Rev. Stat. § 629(16) with its narrower "providing for equal rights" language. This language is now contained in 28 U. S. C. § 1343(3), the jurisdictional counterpart of § 1983. *Chapman,* 441 U. S., at 608.

There is no commentary or other information surrounding the addition of the phrase "and laws" to the remedial provisions of present day § 1983. The revisers' draft of their work, published in 1872, and the marginal notes to §§ 629(16) and 563(12), which appeared in the completed version of the Revised Statutes themselves, provide some clues as to Congress' intent in adopting the change. The marginal note to § 629(16) states: "Suits to redress the deprivation of rights secured by the Constitution and laws to persons within jurisdiction of United States." The note then cross cites to § 1 of the 1871 Act, §§ 16 and 18 of the Enforcement Act of 1870, and § 3 of the 1866 Act. Both §§ 629(16) and 563(12) were followed by bracketed citations to Rev. Stat. § 1979, present day § 1983, and Rev. Stat. § 1977, present day § 1981. Rev. Stat. 95, 111 (1874). The revisers' draft of 1872 contains the following notation concerning § 629(16):

> "It may have been the intention of Congress to provide, by this enactment [the Civil Rights Act of 1871], for all the cases of deprivations mentioned in the previous act of 1870, and thus actually to supersede the indefinite provision contained in that act. But as it might perhaps be held that only such rights as are specifically secured by the Constitution, and not every right secured by a law authorized by the Constitution, were here intended, it is deemed safer to add a reference to the civil rights act." 1 Revision of the United States Statutes as

Drafted by the Commissioners Appointed for that Purpose 362 (1872).

We have noted in the past that the addition of the phrase "and laws" to the text of what is now § 1983, although not without its ambiguities as to intended scope, was *at least* intended to make clear that that the guarantees contained in § 1 of the 1866 Act and § 16 of the Enforcement Act of 1870 were to be enforced against state actors through the express remedy for damages contained in § 1983. See *Chapman,* 441 U. S., at 617 (footnote omitted) (Section 1 of the 1871 Act "served only to ensure that an individual had a cause of action for violations of the Constitution, which in the Fourteenth Amendment embodied and extended to all individuals as against state action the substantive protections afforded by § 1 of the 1866 Act"); *id.,* at 668 (WHITE, J., concurring in judgment). See also *Maine* v. *Thiboutot,* 448 U. S. 1, 7 (1980) ("There is no express explanation offered for the insertion of the phrase 'and laws.' On the one hand, a principal purpose of the added language was to ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute") (some internal quotations omitted).

## III

We think the history of the 1866 Act and the 1871 Act recounted above indicates that Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981. That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the "state action" portion of § 1981, where Congress has established its own remedial scheme. In the context of the application of § 1981 and § 1982 to private actors, we "had little choice but to hold that aggrieved individuals

could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*"  *Cannon*, 441 U. S., at 728 (WHITE, J., dissenting) (emphasis added; footnote omitted).  That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute.  See *National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 458 (1974) ("A frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies"); accord, *Fleischmann Corp.* v. *Maier Brewing Co.*, 386 U. S. 714, 720 (1967); *Cannon, supra*, at 718–724 (WHITE, J., dissenting).

Petitioner cites 42 U. S. C. § 1988, and argues that that provision "compels adoption of a *respondeat superior* standard."  Brief for Petitioner 27.  That section, as amended, provides in pertinent part:

> "The jurisdiction in civil . . . matters conferred on the district courts by the provisions of this [chapter and Title 18], for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and the statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . ."

Far from supporting petitioner's call for the creation or implication of a damages remedy broader than that provided by § 1983, we think the plain language of § 1988 supports the result we reach here. As we noted in *Moor* v. *County of Alameda*, 411 U. S. 693, 706 (1973), in rejecting an argument similar to petitioner's contention here: "[Section 1988] expressly limits the authority granted federal courts to look to the common law, as modified by state law, to instances in which that law 'is not inconsistent with the Constitution and laws of the United States.'" *Ibid.* See also *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 465 (1975). As we indicated in *Moor*, "Congress did not intend, *as a matter of federal law*, to impose vicarious liability on municipalities for violations of federal civil rights by their employees." 411 U. S., at 710, n. 27. Section 1983 provides an explicit remedy in damages which, with its limitations on municipal liability, Congress thought "suitable to carry . . . into effect" the rights guaranteed by § 1981 as against state actors. Thus, if anything, § 1988 points us in the direction of the express federal damages remedy for enforcement of the rights contained in § 1981, not state common law principles.

Our conclusion that the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units finds support in our decision in *Brown* v. *GSA*, 425 U. S. 820 (1976). In *Brown*, we dealt with the interaction of § 1981 and the provisions of § 717 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–16, which proscribe discrimination in federal employment and establish an administrative and judicial enforcement scheme. The petitioner in *Brown* had been passed over for federal promotion on two occasions, and after the second occasion he filed a complaint with his agency alleging that he was denied promotion because of his race. The agency's Director of Civil Rights concluded after investigation that race had not entered into the promotional process, and informed Brown by

letter of his right under § 717(c) to bring an action in federal district court within 30 days of the agency's final decision. Forty-two days later Brown filed suit in federal court, alleging violations of both Title VII and § 1981. The lower courts dismissed Brown's complaint as untimely under § 717(c), and this Court affirmed, holding that § 717 of Title VII constituted the exclusive remedy for allegations of racial discrimination in federal employment.

The Court began its analysis by noting that "Congress simply failed explicitly to describe § 717's position in the constellation of antidiscrimination law." 425 U. S., at 825. We noted that in 1972, when Congress extended the strictures of Title VII to federal employment, the availability of an implied damages remedy under § 1981 for employment discrimination was not yet clear. *Id.*, at 828. The Court found that this perception on the part of Congress, "seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.*, at 828–829. The Court bolstered its holding by invoking the general principle that "a precisely drawn, detailed statute pre-empts more general remedies." *Id.*, at 834.

In *Brown*, as here, while Congress has not definitively spoken as to the relationship of § 1981 and § 1983, there is very strong evidence that the 42d Congress which enacted the precurser of § 1983 thought that it was enacting the first, and at that time the only, federal damages remedy for the violation of federal constitutional and statutory rights by state governmental actors. The historical evidence surrounding the revision of 1874 further indicates that Congress thought that the declaration of rights in § 1981 would be enforced against state actors through the remedial provisions of § 1983. That remedial scheme embodies certain limitations on the liability of local governmental entities based on federalism concerns which had very real constitutional underpinnings for the Reconstruction Congresses. As petitioner

here would have it, the careful balance drawn by the 42d Congress between local autonomy and fiscal integrity and the vindication of federal rights could be completely upset by an artifice of pleading.

Since our decision in *Monell*, the Courts of Appeals have unanimously rejected the contention, analogous to petitioner's argument here, that the doctrine of *respondeat superior* is available against a municipal entity under a *Bivens*-type action implied directly from the Fourteenth Amendment. See, *e. g., Tarpley* v. *Greene*, 221 U. S. App. D. C. 227, 237, n. 25, 684 F. 2d 1, 11, n. 25 (1982) (Edwards, J.) ("Because Congress has elected not to impose *respondeat superior* liability under § 1983, appellant invites this court to expand the remedial options under *Bivens* [v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)]. We can find no good logic nor sound legal basis for this view; we therefore decline the invitation"); accord, *Owen* v. *Independence*, 589 F. 2d 335, 337 (CA8 1978); *Thomas* v. *Shipka*, 818 F. 2d 496 (CA6 1987); *Ellis* v. *Blum*, 643 F. 2d 68, 85 (CA2 1981); *Cale* v. *Covington*, 586 F. 2d 311, 317 (CA4 1978); *Molina* v. *Richardson*, 578 F. 2d 846 (CA9), cert. denied, 439 U. S. 1048 (1978). Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the protections of the 1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. We hold that the express "action at law" provided by § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor. Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his "right to make contracts" protected

by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.

IV

The jury found that Principal Todd had violated petitioner's rights under § 1981, the First Amendment, and the Equal Protection Clause in recommending petitioner's removal from the athletic director and head coaching positions at South Oak. As to the liability of the DISD, the trial judge gave the jury the following instruction:

> "A public independent school district (such as and including the Dallas Independent School District), acts by and through its Board of Trustees and/or its delegated administrative officials (including the Superintendent and school principals), with regard to action taken against or concerning school district personnel.
>
> "A public independent school district (such as and including the Dallas Independent School District) is liable for the actions of its Board of Trustees and/or its delegated administrative officials (including the Superintendent and school principals), with regard to wrongful or unconstitutional action taken against or concerning school district personnel." App. 31.

We agree with the Court of Appeals that this instruction was manifest error. The instruction seems to rest either on the assumption that both Principal Todd and Superintendent Wright were policymakers for the school district, or that the school district is vicariously liable for any actions taken by these employees. Since we have rejected *respondeat superior* as a basis for holding a state actor liable under § 1983 for violation of the rights enumerated in § 1981, we refer to the principles to be applied in determining whether either Principal Todd or Superintendent Wright can be considered policymakers for the school district such that their decisions may rightly be said to represent the official policy of the DISD subjecting it to liability under § 1983.

Last Term in *St. Louis* v. *Praprotnik*, 485 U. S. 112 (1988), (plurality opinion), we attempted a clarification of tools a federal court should employ in determining where policymaking authority lies for purposes of § 1983. In *Praprotnik*, the plurality reaffirmed the teachings of our prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law.*" *Id.*, at 123 (emphasis in original), quoting *Pembaur*, 475 U. S., at 483 (plurality opinion). As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as "'custom or usage' having the force of law," *Praprotnik, supra,* at 124, n. 1, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see *Monell*, 436 U. S., at 661, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. See *Pembaur, supra,* at 485–487 (WHITE, J, concurring).

We cannot fault the trial judge for not recognizing these principles in his instructions to the jury since this action was tried in October 1984, and the District Court did not have the benefit of our decisions in either *Pembaur* or *Praprotnik* to guide it. Similarly, the Court of Appeals issued its decision in this action before our decision in *Praprotnik*. Pursuant to its cross-petition in No. 88–214, the school district urges us

to review Texas law and determine that neither Principal Todd nor Superintendent Wright possessed the authority to make final policy decisions concerning the transfer of school district personnel. See Brief for Respondent 6–8. Petitioner Jett seems to concede that Principal Todd did not have policymaking authority as to employee transfers, see Brief for Petitioner 30, but argues that Superintendent Wright had been delegated authority to make school district policy concerning employee transfers and that his decisions in this area were final and unreviewable. *Id.*, at 30–32.

We decline to resolve this issue on the record before us. We think the Court of Appeals, whose expertise in interpreting Texas law is greater than our own, is in a better position to determine whether Superintendent Wright possessed final policymaking authority in the area of employee transfers, and if so whether a new trial is required to determine the responsibility of the school district for the actions of Principal Todd in light of this determination. We thus affirm the judgment of the Court of Appeals to the extent it holds that the school district may not be held liable for its employees' violation of the rights enumerated in § 1981 under a theory of *respondeat superior.* We remand these cases to the Court of Appeals for it to determine where final policymaking authority as to employee transfers lay in light of the principles enunciated by the plurality opinion in *Praprotnik* and outlined above.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join Parts I and IV of the Court's opinion, and Part III except insofar as it relies upon legislative history. To hold that the more general provisions of 42 U. S. C. § 1981 establish a mode of liability for a particular category of offense by municipalities that is excluded from the closely related statute (42 U. S. C. § 1983) which deals more specifically with that precise category of offense would violate the rudimen-

tary principles of construction that the specific governs the general, and that, where text permits, statutes dealing with similar subjects should be interpreted harmoniously.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

To anyone familiar with this and last Terms' debate over whether *Runyon* v. *McCrary*, 427 U. S. 160 (1976), should be overruled, see *Patterson* v. *McLean Credit Union*, *ante*, p. 164, today's decision can be nothing short of astonishing. After being led to believe that the hard question under 42 U. S. C. § 1981—the question that prompted this Court, on its own initiative, to set *Patterson* for reargument, 485 U. S. 617 (1988)—was whether the statute created a cause of action relating to *private* conduct, today we are told that the hard question is, in fact, whether it creates such an action on the basis of *governmental* conduct. It is strange, indeed, simultaneously to question whether § 1981 creates a cause of action on the basis of private conduct *(Patterson)* and whether it creates one for governmental conduct (these cases)—and hence to raise the possibility that this landmark civil rights statute affords no civil redress at all.

In granting certiorari in these cases we did not, as the plurality would have it, agree to review the question whether one may bring a suit for damages under § 1981 itself on the basis of governmental conduct. The plurality hints that petitioner Jett offered this issue for our consideration, *ante*, at 711 ("In essence, petitioner argues that in 1866 the 39th Congress intended to create a cause of action for damages against municipal actors and others who violated the rights now enumerated in § 1981"), when in fact, it was *respondent* who raised this issue, and who did so for the first time in its brief on the merits in this Court.[1] In six years of proceedings in

---

[1] The plurality twice cites petitioner Jett's opening brief, *ante*, at 712, as if it presents this question. Neither of the passages to which the plurality refers, however, even remotely suggests that Jett anticipated, let alone

the lower courts, including a jury trial and an appeal that produced two opinions, respondent never once suggested that Jett's only remedy was furnished by § 1983. Petitioner was able to respond to this argument only in his reply brief in this Court. While it is true that we often affirm a judgment on a ground not relied upon by the court below, we ordinarily do so only when that ground at least was raised below. See, *e. g., Heckler* v. *Campbell*, 461 U. S. 458, 468, n. 12 (1983); *Washington* v. *Yakima Indian Nation*, 439 U. S. 463, 476, n. 20 (1979); *Hankerson* v. *North Carolina*, 432 U. S. 233, 240, n. 6 (1977); *Massachusetts Mutual Life Ins. Co.* v. *Ludwig*, 426 U. S. 479 (1976); *Dandridge* v. *Williams*, 397 U. S. 471, 475, n. 6 (1970).

It is not only unfair to decide the action on this basis; it is unwise. The question is important; to resolve it on the basis of largely one-sided briefing, without the benefit of the views of the courts below, is rash. It is also unnecessary. The Court appears to decide today (though its precise holding is less than pellucid) that liability for violations by the government of § 1981 may not be predicated on a theory of *respondeat superior*. The answer to that question would dispose of Jett's contentions. In choosing to decide, as well, whether § 1983 furnishes the exclusive remedy for violations of § 1981 by the government, the Court makes many mistakes that might have been avoided by a less impetuous course.

Because I would conclude that § 1981 itself affords a cause of action in damages on the basis of governmental conduct violating its terms, and because I would conclude that such an action may be predicated on a theory of *respondeat superior*, I dissent.

I

Title 42 U. S. C. § 1981, originally enacted as part of § 1 of the Civil Rights Act of 1866 (1866 Act), provides in full:

---

raised, the argument that respondent advanced for the first time in its own brief on the merits.

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The question is whether this statute permits a cause of action in damages against those who violate its terms.

The plurality approaches this issue as though it were new to us, recounting in lengthy and methodical detail the introduction, debate, passage, veto, and enactment of the 1866 Act. The story should by now be familiar to anyone with even a passing acquaintance with this statute. This is so because we have reviewed this history in the course of deciding—and reaffirming the answer to—the very question that the plurality deems so novel today. See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969); *Tillman* v. *Wheaton-Haven Recreation Assn., Inc.*, 410 U. S. 431 (1973); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454 (1975); *Runyon* v. *McCrary*, 427 U. S. 160 (1976); *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273 (1976); *Delaware State College* v. *Ricks*, 449 U. S. 250 (1980); *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375 (1982); *Saint Francis College* v. *Al-Khazraji*, 481 U. S. 604 (1987); *Shaare Tefila Congregation* v. *Cobb*, 481 U. S. 615 (1987); *Goodman* v. *Lukens Steel Co.*, 482 U. S. 656 (1987); *Patterson* v. *McLean Credit Union, ante*, p. 164. An essential aspect of the holding in each of these cases was the principle that a person injured by a violation of § 1 of the 1866 Act (now 42 U. S. C. §§ 1981 and 1982) may bring an action for damages under that statute against the person who violated it.

We have had good reason for concluding that § 1981 itself affords a cause of action against those who violate its terms. The statute does not explicitly furnish a cause of action for the conduct it prohibits, but this fact was of relatively little moment at the time the law was passed. During the period when § 1 of the 1866 Act was enacted, and for over 100 years thereafter, the federal courts routinely concluded that a statute setting forth substantive rights without specifying a remedy contained an implied cause of action for damages incurred in violation of the statute's terms. See, *e. g.*, *Marbury* v. *Madison*, 1 Cranch 137, 162–163 (1803); *Kendall* v. *United States*, 12 Pet. 524, 624 (1838); *Pollard* v. *Bailey*, 20 Wall. 520, 527 (1874); *Hayes* v. *Michigan Central R. Co.*, 111 U. S. 228, 240 (1884); *De Lima* v. *Bidwell*, 182 U. S. 1, 176–177 (1901); *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548, 569, 570 (1930); *Bell* v. *Hood*, 327 U. S. 678, 684, and n. 6 (1946); *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 433 (1964). The classic statement of this principle comes from *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39–40 (1916), in which we observed: "A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law." These cases fit comfortably within *Rigsby*'s framework. It is of small consequence, therefore, that the 39th Congress established no explicit damages remedy in § 1 of the 1866 Act.[2]

---

[2] During the 1970's, we modified our approach to determining whether a statute contains an implied cause of action, announcing the following four-part test:

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area

Indeed, the debates on § 1 demonstrate that the legislators' worry was not that their actions would do too much, but that they would do too little. In introducing the bill that became the 1866 Act, Senator Trumbull explained that the statute was necessary because "[t]here is very little importance in the general declaration of abstract truths and principles [contained in the Thirteenth Amendment] unless they can be carried into effect, *unless the persons who are to be affected by them have some means of availing themselves of their benefits.*" Cong. Globe, 39th Cong., 1st Sess., 474 (1866) (emphasis added). Representative Thayer of Pennsylvania echoed this theme: "When I voted for the amendment to abolish slavery . . . I did not suppose that I was offering . . . a mere paper guarantee." "The bill which now engages the attention of the House has for its object to carry out and guaranty

---

basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort* v. *Ash*, 422 U. S. 66, 78 (1975) (citations omitted), quoting *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S., at 39.

It would make no sense, however, to apply a test first enunciated in 1975 to a statute enacted in 1866. An inquiry into Congress' actual intent must take account of the interpretive principles in place at the time. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 698–699 (1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 375–378 (1982). See also *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 496 (1987) (SCALIA, J., concurring) (advising against construing a statute on the basis of an interpretive principle announced after the statute was passed). Thus, I would interpret § 1981 in light of the principle described in *Rigsby*, rather than the one described in *Cort*.

Application even of the test fashioned in *Cort*, however, would lead to the conclusion that Jett may bring a cause of action in damages against respondent under § 1981. Jett belongs to the special class of persons (those who have been discriminated against in the making of contracts) for whom the statute was created; all of the indicators of legislative intent point in the direction of an implied cause of action; such an action is completely consistent with the statute's purposes; and, in view of the fact that this Reconstruction-era legislation was in part designed to curtail the authority of the States, it would be unreasonable to conclude that this cause of action is one relegated to state law.

the reality of that great measure. It is to give to it practical effect and force. It is to prevent that great measure from remaining a dead letter upon the constitutional page of this country." *Id.*, at 1151.

In these circumstances, it would be unreasonable to conclude that inferring a private cause of action from § 1981 is incompatible with Congress' intent. Yet in suggesting that § 2 of the 1866 Act demonstrates Congress' intent that criminal penalties serve as the only remedy for violations of § 1, *ante*, at 715–721, this is exactly the conclusion that the plurality apparently would have us draw. Not only, however, is this argument contrary to legislative intent, but we have already squarely rejected it. In *Jones* v. *Alfred H. Mayer Co.*, respondent argued that because § 2 furnished criminal penalties for violations of § 1 occurring "under color of law," § 1 could not be read to provide a civil remedy for violations of the statute by private persons. Dismissing this argument, we explained: "[Section] 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated 'under color of law' were to be criminally punishable under § 2." 392 U. S., at 426.[3]

---

[3]The Court's heavy emphasis on § 2 of the 1866 Act also ignores the fact that the modern-day descendant of § 1 of the Act, 42 U. S. C. § 1981, includes no remedy or penalty at all. Section 2 of the 1866 Act now appears at 18 U. S. C. § 242, see *United States* v. *Classic*, 313 U. S. 299, 327, n. 10 (1941), a part of the Code entirely separate from § 1981, and is applicable to provisions other than § 1981. These facts strongly argue against placing too much weight on the availability of criminal penalties in deciding whether § 1981 contains an implied cause of action.

The plurality's assertion that the 1866 Act created no original federal jurisdiction for civil actions based on the statute, see *ante*, at 721, is similarly unavailing. The language of § 3 easily includes original jurisdiction over such suits, and we have in fact concluded as much. See *Moor* v. *County of Alameda*, 411 U. S. 693, 704–705 (1973) ("The initial portion of § 3 of the Act established federal jurisdiction to hear, among other things, civil actions brought to enforce § 1"). In addition, the plurality's argument con-

The only way that the plurality can distinguish *Jones*, and the cases following it, from this action is to argue that our recognition of an implied cause of action against private persons did not include recognition of an action against local governments and government officials. But before today, no one had questioned that a person could sue a government official for damages due to a violation of § 1981. We have, in fact, reviewed two cases brought pursuant to § 1981 against government officials or entities, without giving the vaguest hint that the lawsuits were improperly brought. See *Hurd* v. *Hodge,* 334 U. S. 24 (1948); *Takahashi* v. *Fish and Game Comm'n,* 334 U. S. 410 (1948). Indeed, in *Jones* v. *Alfred H. Mayer Co.,* the dissenters relied on *Hurd* v. *Hodge* in arguing that § 1981 applied *only* to governmental conduct. 392 U. S., at 452. The lower courts have heeded well the message from our cases: they unanimously agree that suit may be brought directly under § 1981 against government officials who violate the statute's terms. See, *e. g., Metrocare* v. *Washington Metropolitan Area Transit Auth.,* 220 U. S. App. D. C. 104, 679 F. 2d 922 (1982); *Springer* v. *Seamen,* 821 F. 2d 871 (CA1 1987); *Mahone* v. *Waddle,* 564 F. 2d 1018 (CA3 1977), cert. denied, 438 U. S. 904 (1978); *Jett* v. *Dallas Independent School Dist.,* 798 F. 2d 748 (CA5 1986), on motion for rehearing, 837 F. 2d 1244 (1988) (case below); *Leonard* v. *Frankfort Electric and Water Plant Board,* 752 F. 2d 189 (CA6 1985); *Bell* v. *Milwaukee,* 746 F. 2d 1205 (CA7 1984); *Taylor* v. *Jones,* 653 F. 2d 1193 (CA8 1981); *Greenwood* v. *Ross,* 778 F. 2d 448 (CA8 1985); *Sethy* v. *Alameda County Water Dist.,* 545 F. 2d 1157 (CA9 1976) (en banc).

Perhaps recognizing how odd it would be to argue that one may infer from § 1 of the 1866 Act a cause of action against private persons, but not one against government officials, the Court appears to claim that the 1871 Act erased whatever

fuses the question of which courts (state or federal) will enforce a cause of action with whether a cause of action exists.

action against government officials previously existed under the 1866 Act.   The Court explains:

> "That we have read § 1 of the 1866 Act to reach private action and have implied a damages remedy to effectuate the declaration of rights contained in that provision does not authorize us to do so in the context of the 'state action' portion of § 1981, where Congress has established its own remedial scheme.   In the context of the application of § 1981 and § 1982 to private actors, we 'had little choice but to hold that aggrieved individuals could enforce this prohibition, *for there existed no other remedy to address such violations of the statute.*' . . . That is manifestly not the case here, and whatever the limits of the judicial power to imply or create remedies, it has long been the law that such power should not be exercised in the face of an express decision by Congress concerning the scope of remedies available under a particular statute."   *Ante,* at 731–732, quoting *Cannon* v. *University of Chicago,* 441 U. S. 677, 728 (1979) (WHITE, J., dissenting) (emphasis in original; footnote omitted).

This argument became available only after § 1983 was passed, and thus suggests that § 1983 changed the cause of action implicitly afforded by § 1981.   However, not only do we generally disfavor repeals by implication, see, *e. g., Morton* v. *Mancari,* 417 U. S. 535, 549–550 (1974); *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936); *Henderson's Tobacco,* 11 Wall. 652, 656–658 (1871), but we should be particularly hostile to them when the allegedly repealing statute specifically rules them out.   In this regard, § 7 of the 1871 Act is highly significant; it provided "[t]hat nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto."   § 7, 17 Stat. 15.[4]

---

[4] Several *amici* argue that we need not conclude that § 1983 impliedly repealed the cause of action furnished by § 1981 in order to decide that

The Court's argument fails for other reasons as well. Its essential point appears to be that, in § 1983, "Congress has established its own remedial scheme" for the "'state action' portion of § 1981."[5]  *Ante*, at 731.  For this argument, the Court may not rely, as it attempts to do, on the principle that "'when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the stat-

§ 1983 provides the sole remedy for violations of § 1981.  See Brief for International City Management Association et al. as *Amici Curiae* 18–19. Their theory is that an implied cause of action did not exist when the 1871 Act was passed, and that therefore one may argue that the 1871 Act furnished the only remedy for the 1866 Act without arguing that the later statute in any way repealed the earlier one.  To support their premise, they observe, first, that it was not until the 1960's that courts recognized a private cause of action under § 1 of the 1866 Act.  In doing so, they ignore our earlier cases approving actions brought directly under § 1981.  See *Hurd* v. *Hodge*, 334 U. S. 24 (1948).  In any event, the relevance of the date on which we expressly recognized that one could bring a suit for damages directly under § 1 escapes me; that we did so in the 1960's does not suggest that we would not have done so had we faced the question in the 1860's.

*Amici* assert, in addition, that "[i]n recognizing an implied cause of action" under § 1981, we "rested in part on congressional actions that postdate the creation in 1871 of an explicit civil cause of action for violations of Section 1981."  Brief for International City Management Association et al. as *Amici Curiae* 19.  It is true that *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 412, n. 1 (1968), and *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 238 (1969), cited 28 U. S. C. § 1343(4) in support of federal jurisdiction over those cases.  I do not understand, however, how this shows that the 1866 Act as originally enacted did not confer federal jurisdiction over actions to recover damages for violations of the statute.  Moreover, even if the 1866 Act did not confer such jurisdiction, the jurisdictional question is separate from the question whether a cause of action may be inferred from the statute.  Indeed, *amici* appear to recognize as much when they argue that although § 1 did not establish federal jurisdiction to hear civil actions based on the statute, Congress "left the task of civil enforcement to the state courts."  Brief for International City Management Association et al. as *Amici Curiae* 17.  I cannot imagine what "civil enforcement" *amici* have in mind, unless it is the civil remedy that Jett seeks.

[5] The one bright spot in today's decision is its reaffirmation of our holding in *Maine* v. *Thiboutot*, 448 U. S. 1 (1980).

ute to subsume other remedies.'" *Ante*, at 732, quoting *National Railroad Passenger Corporation* v. *National Assn. of Railroad Passengers*, 414 U. S. 453, 458 (1974). That principle limits the inference of a remedy for the violation of a statute only when *that same statute* already sets forth specific remedies. It cannot be used to support the argument that the provision of particular remedies in § 1983 tells us whether we should infer a damages remedy for violations of § 1981.

The suggestion, moreover, that today's holding "finds support in" *Brown* v. *GSA*, 425 U. S. 820 (1976), is audacious. *Ante*, at 733. Section 1983—which, for example, specifies no exhaustion requirement, no damages limitation, no defenses, and no statute of limitations—can hardly be compared with § 717 of the Civil Rights of 1964, at issue in *Brown*, with its many detailed requirements and remedies, see 425 U. S., at 829–832. Indeed, in *Preiser* v. *Rodriguez*, 411 U. S. 475, 489 (1973), we emphasized the "general" nature of § 1983 in refusing to allow former prisoners to challenge a prison's withholding of good-time credits under § 1983 rather than under the federal habeas corpus statute, 28 U. S. C. § 2254. We never before have suggested that § 1983's remedial scheme is so thorough that it pre-empts the remedies that might otherwise be available under other statutes; indeed, all of our intimations have been to the contrary. See, *e. g.*, *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 19–21 (1981).

According to the Court, to allow an action complaining of government conduct to be brought directly under § 1981 would circumvent our holding in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), that liability under § 1983 may not be based on a theory of *respondeat superior*. *Ante*, at 735–736. Not only am I unconvinced that we should narrow a statute as important as § 1981 on the basis of something so vague and inconclusive as "federalism concerns which had very real constitutional underpinnings

for the Reconstruction Congresses," *ante*, at 734, but I am also unable to understand how *Monell*'s limitation on § 1983 liability begins to tell us whether the same restriction exists under § 1981, enacted five years earlier than § 1983 and covering a far narrower range of conduct. It is difficult to comprehend, in any case, why the Court is worried that construing § 1981 to create a cause of action based on governmental conduct would render local governments vicariously liable for the delicts of their employees, since it elsewhere goes to great lengths to suggest that liability under § 1981 may *not* be vicarious. See *ante*, at 718–720.

The Court's primary reason for distinguishing between private and governmental conduct under § 1981 appears to be its impression that, because private conduct is not actionable under § 1983, we "had little choice" but to hold that private individuals who violated § 1981 could be sued directly under § 1981. See *ante*, at 731. This claim, however, suggests that whether a cause of action in damages exists under § 1981 depends on the scope of § 1983. In deciding whether a particular statute includes an implied cause of action, however, we have not in the past suggested that the answer will turn on the reach of a different statute. In *National Sea Clammers*, for example, we analyzed both the question whether the Federal Water Pollution Control Act included an implied cause of action for damages, 453 U. S., at 13–19, and the question whether an action could be brought under § 1983 for violations of that statute, *id.*, at 19–21, thus indicating that the answer to the latter question does not tell us the answer to the former one.

The Court's approach not only departs from our prior analysis of implied causes of action, but also attributes an intent to the 39th Congress that fluctuates depending on the state of the law with regard to § 1983. On the Court's theory, if this case had arisen during the period between our decisions in *Monroe* v. *Pape*, 365 U. S. 167 (1961), and *Monell* v. *New York City Dept. of Social Services, supra*, when we be-

lieved that local governments were not "persons" within the meaning of § 1983, we would apparently have been required to decide that a cause of action could be brought against local governments and their officials directly under § 1981. The plurality, in fact, confirms this conclusion in distinguishing *Hurd* v. *Hodge*, 334 U. S. 24 (1948), solely on the ground that we decided it at a time when § 1983 did not apply to the District of Columbia. See *ante*, at 713. In other words, on the Court's view, a change in the scope of § 1983 alters the reach of § 1981. I cannot endorse such a bizarre conception of congressional intent.

## II

I thus would hold that Jett properly brought his suit against respondent directly under § 1981. It remains to consider whether that statute permits recovery against a local government body on a theory of *respondeat superior*.

Because § 1981 does not explicitly create a cause of action in damages, we would look in vain for an express statement that the statute contemplates liability based on the doctrine of *respondeat superior*. In *Monell* v. *New York City Dept. of Social Services*, *supra*, however, our background assumption appears to have been that unless a statute subjecting institutions (such as municipalities) to liability evidences an intent not to impose liability on them based on *respondeat superior*, such liability will be assumed. *Id.*, at 691. The absolute language of § 1981 therefore is significant: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U. S. C. § 1981. Certainly nothing in this wording refutes the argument that vicarious liability may be imposed under this law.

Section 1983, in contrast, forbids a person to "subjec[t], or caus[e] to be subjected" another person to a deprivation of the rights protected by the statute. It is telling that § 1981 does not contain this explicit language of causation. In holding in *Monell* that liability under § 1983 may not be predi-

cated on a theory of *respondeat superior*, we emphasized that § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights. . . . Indeed, the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." 436 U. S., at 692. The absence of this language in § 1 of the 1866 Act, now § 1981, argues against the claim that liability under this statute may not be vicarious.

While it acknowledged that § 1 of the 1866 Act did not contain the "subjects, or causes to be subjected" language of § 1983, the Court of Appeals nevertheless emphasized that § 2 of the 1866 Act did contain this language. 837 F. 2d, at 1247. There is not the least inconsistency, however, in arguing that the *criminal* penalties under the 1866 Act may not be imposed on the basis of *respondeat superior*, but that the civil penalties may be. Indeed, it is no surprise that the history surrounding the enactment of § 2, as the plurality stresses, *ante*, at 719–720, indicates that Congress envisioned criminal penalties only for those who by their own conduct violated the statute, since vicarious criminal liability would be extraordinary. The same cannot be said of vicarious civil liability.

Nor does anything in the history of § 1981 cast doubt on the argument that liability under the statute may be vicarious. The Court of Appeals placed heavy reliance on Congress' rejection of the Sherman amendment, which would have imposed a dramatic form of vicarious liability on municipalities, five years after passing the 1866 Act. 837 F. 2d, at 1246–1247. That the plurality appears to accept this argument, see *ante*, at 726–729, is curious, given our frequent reminder that "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S.

102, 117 (1980), quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960). I do not understand how Congress' rejection of an amendment imposing a very new kind of vicarious liability on municipalities can tell us what a different and earlier Congress intended with respect to conventional vicarious liability.

According to the plurality, the history of the Sherman amendment is relevant to the interpretation of § 1981 because it reveals Congress' impression that it had no authority to subject municipalities to the kind of liability encompassed by the amendment. See *ante*, at 727–729. The plurality fails to recognize, however, that the circumstances in which municipalities would be vicariously liable under the Sherman amendment are very different from those in which they would be liable under § 1981. As the plurality describes it, the Sherman amendment "provided that where injuries to person or property were caused by mob violence directed at the enjoyment or exercise of federal civil rights, 'the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense.'" *Ante*, at 727, quoting Cong. Globe, 42d Cong., 1st Sess., 755 (1871). Because the threat of such liability would have forced municipalities to ensure that private citizens did not violate the rights of others, it would have run up against Justice Story's conclusion in *Prigg* v. *Pennsylvania*, 16 Pet. 539, 616 (1842), that Congress could not "insist that the states are bound to provide means to carry into effect the duties of the national government." To hold a local government body liable for the discriminatory cancellation of a contract entered into by that local body itself, however, is a very different matter. Even assuming that the 39th Congress had the same constitutional concerns as the 42d, therefore, those concerns cast no doubt on Congress' authority to hold local government bodies vicariously liable under § 1 of the 1866 Act in circumstances such as those present here.

I thus would conclude that liability under § 1981 may be predicated on a theory of *respondeat superior.*

### III

No one doubts that § 1983 was an unprecedented federal statute. See *ante,* at 723–726. The question is not whether § 1983 wrought a change in the law, but whether it did so in such a way as to withdraw a remedy that § 1 of the 1866 Act had implicitly afforded. Unlike the plurality, I would conclude that it did not.

JUSTICE STEVENS, dissenting.

My agreement with JUSTICE BRENNAN's dissent is buttressed by the views I expressed in *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1, 22 (1981) (opinion concurring in judgment in part and dissenting in part), and in *Oklahoma City* v. *Tuttle,* 471 U. S. 808, 834 (1985) (dissenting opinion).