**K.P. YOHANNAN, Plaintiff,**

v.

**Ann PATLA, Director of the Illinois Department of Mental Health & Developmental Disabilities; Illinois Department of Mental Health and Developmental Disabilities; Manuel Duran; Jackie Crilly; and Dale Awick, Defendants.**

No. 96 C 5515.

United States District Court,
N.D. Illinois,
Eastern Division.

June 23, 1997.

Ayesha Salima Hakeem, Chicago, IL, for Plaintiff.

Maura Ann Fennelly, Illinois Attorney General, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff K.P. Yohannan brings this three-count complaint under 42 U.S.C. §§ 1981, 1983, 1985(3), alleging that the defendants unlawfully discriminated against him based on his race and national origin when he was fired from the Illinois Department of Mental Health and Developmental Disabilities (the Department). Presently before this court is the defendants' motion for summary judgment. For the reasons discussed below, we grant the motion.

## I. Background [1]

Yohannan, who is Asian–Indian, worked at the Kiley Mental Health Center as a Mental Health Technician from September 1984 until January 1995. As a Mental Health Technician, the plaintiff's primary duty was to supervise ten mental health patients in the particular "Unit" and "Home" assigned to him. Yohannan's discharge arose from an incident that occurred on September 20, 1994, when he was assigned to the night shift of Unit 1, Home 7. According to Mental Health Supervisor Manuel Duran, at 6:03 am,

---

**1.** In order to focus litigants on the relevant disputed facts, General Rule 12(M) of the United States District Court for the Northern District Court of Illinois requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." The non-movant must then specifically respond to each of the movant's factual assertions, and include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). The facts asserted in the movant's 12(M) Statement will be deemed admitted if the non-movant's responses do not contain citations to specific portions of the record supporting the contrary position. *Skagen v. Sears, Roebuck & Co.,* 910 F.2d 1498, 1500 (7th Cir.1990). In addition, under Local Rule 12(N)(3)(b), the non-movant may submit a statement of additional facts that the non-movant contends require denial of the motion, and Local Rule 12(M) provides that the movant may likewise respond to the 12(N)(3)(b) statement.

Duran entered Home 7 and saw Yohannan sleeping. Pl.'s 12(N)(3)(b) ¶ 24; Defs.' 12(M) ¶ 10. Yohannan, in contrast, denies that he was sleeping and indeed avers that he had just completed an hourly check-in telephone call at 6:02 am. Pl.'s 12(N) ¶ 10. Duran reported his observation, which if true was the plaintiff's second sleeping-on-duty offense, to Unit 1 Administrator Jackie Crilly. Defs.' 12(M) ¶¶ 12–13. According to Crilly, she then considered what sanction to impose pursuant to Kiley's policy, which stated that a second offense of sleeping on duty "usually results in a suspension of greater" than ten days or a discharge. Id. ¶ 15; id., App. A, Ex. 5 (Kiley Policy ¶ II(B)(7)(b)). In recommending a discharge, Crilly avers that she weighed in aggravation Yohannan's prior disciplinary record, including the first sleeping-on-duty offense, and the particular danger posed by sleeping on duty during the third shift, when staffing is minimal. Id. ¶ 15.

Next, Crilly forwarded her recommendation to Kiley Facility Director Dale Awick, who maintains that he concurred with Crilly's recommendation based on the same nondiscriminatory factors upon which she relied. Defs.' 12(M) ¶ 16. In November 1994, Awick sent his recommendation to Labor Relations Administrator David Himpelmann, who was Kiley's liaison with Yohannan's union. Defs.' 12(M) ¶ 19. Pursuant to the collective bargaining agreement at Kiley, Pl.'s 12(N), Ex. I, Agreement art. IX, § 4, Himpelmann held a "pre-disciplinary meeting" on November 29, 1994, Defs.' 12(M) ¶ 20. At the meeting, Yohannan and his union representative, Ralph Coari, presented one side of the story while Yolaine Ayala, the Acting Unit 1 Administrator, and Manuel Duran represented management; Duran, however, was not actually present at the meeting but later met with Himpelmann, Ayala, and Coari. Pl.'s 12(N)(3)(b) ¶ 53.

After the pre-disciplinary meeting, Yohannan was suspended for 30 days pending discharge, that is, he was suspended effective December 9, 1994 until his discharge on January 7, 1995. Defs.' 12(M), App. A, Ex. 10. It appears that the next step was to send the discharge recommendation to the Director of the Department of Central Management Services, Kiley Policy ¶ II(A)(4)(a), which is the state agency charged with administrative oversight of Illinois state employees, 20 ILCS 415/3; 415/8b.16. On January 5, 1995, the Director approved the discharge and notified Yohannan that he could appeal to the Civil Service Commission or file a grievance pursuant to the collective bargaining agreement. Defs.' 12(M), App. A, Ex. T (decision of Director Stephen B. Schnorf). Yohannan filed a grievance, Pl.'s 12(N)(3)(b) ¶ 58, and a "Step 3" hearing was convened on February 15, 1995, before Hearing Officer Robert Cellini, who is an employee of the Department, Defs.' 12(M) ¶ 21. At the Step 3 hearing, Yohannan testified and presented arguments with the help of a union representative, and it appears that Duran and Solomon represented the Department. On March 27, 1995, Cellini denied the grievance, finding that Yohannan's discharge was for "just cause." Defs.' 12(M), App. A, Ex. 11.

Finally, the plaintiff invoked the next level of grievance procedure, which resulted in a proposed settlement negotiated by the union representative and the Department. Defs.' 12(M) App. A, Ex. 12 (Resolution Prior to Arbitration dated May 1995). However, Yohannan refused to sign the proposal, which called for him to resign in exchange for the purging of any mention of the discharge from personnel records, because he felt the discharge was grounded in discrimination. Pl.'s 12(N) ¶ 24. In 1996, Yohannan filed the instant suit, and we now consider the pending summary judgment motion.

## II. Standard for Reviewing Motions for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact, and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant bears the initial burden to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting FED. R. Civ. P.

56(c)). Material facts are those determinative of the outcome of an issue as determined by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant has done this, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party, *see Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14, and refrain from making credibility determinations, *see Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992).

## III. Discussion

### A. Claim or Issue Preclusion

A threshold issue raised by the defendants is whether claim or issue preclusion bar Yohannan's suit in its entirety or at least in part. According to the defendants, we should give res judicata effect to the Department's decision because it was generated pursuant to a grievance procedure akin to "a quasi[-]judicial forum conducted by an administrative hearing officer." Defs.' Br. at 7. For the reasons that follow, we deny summary judgment on this basis.

▮▮ First, the defendants waived the affirmative defense by failing to include it in their Answer to the Complaint. *See* Docket Entry 11 (Defs.' Answer at 13) (November 12, 1996). Rule 8(c) of the Federal Rules of Civil Procedure requires that, "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively ... res judicata." Although Rules 12(g) and (h) only expressly provide for waiver of Rule 12(b) defenses when omitted from a motion or responsive pleading, Rule 8(c) affirmative defenses are also waived if not included in the defendant's Answer. *See Johnson v. Sullivan,* 922 F.2d 346, 355 (7th Cir.1990) (statute of limitations defense waived if not raised in Answer); *Giotis v. Apollo of the Ozarks, Inc.,* 800 F.2d 660, 664 (7th Cir.1986). Accordingly, the

defendants have waived res judicata as a defense.

▮▮ It is true that a plaintiff may waive waiver by expressly or implicitly consenting to trial of the issue, and Yohannan has not pointed out that the defendants omitted res judicata from the Answer. *See* FED. R. CIV. P. 15(b); *Giotis,* 800 F.2d at 663–64. However, under the law governing the res judicata effect of state agency determinations, the defendants have failed to present a complete factual picture of the Department's adjudicatory procedures, thus foreclosing summary judgment on this issue in any event. We turn to an examination of the pertinent principles in order to explain the defendants' deficiency.

In *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court held that, under the federal common law rules of preclusion, a state agency's determinations may have preclusive effect even if not reviewed and embodied in a state court judgment. "When a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 799, 106 S.Ct. at 3226 (quoting *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)). Thus, the effect of the state agency's decision comprises two questions: (1) a federal question, namely whether the state agency's proceeding was akin to a judicial proceeding in which the parties had an adequate opportunity to litigate; and (2) a state law question, namely whether state courts would accord the state agency's decision preclusive effect. *See id.; compare Buckhalter v. Pepsi–Cola General Bottlers,* 820 F.2d 892, 896 (7th Cir. 1987) (detailing factors considered when determining whether state agency acted in a judicial capacity) *with Schratzmeier v. Mahoney,* 246 Ill.App.3d 871, 186 Ill.Dec. 826, 829, 617 N.E.2d 65, 68 (1993).[2]

---

**2.** Although the two questions are conceptually independent, the answer to one will likely answer the other because whether a state court

would accord preclusive effect to a state agency's determination will usually turn on whether the parties had an adequate opportunity to litigate

■ In this action, the defendants' arguments fail to persuade us that the state agency was acting in a judicial capacity. The most glaring problem with characterizing the Step 3 Hearing as a judicial-like forum is the plaintiff's averment that, after the hearing, Hearing Officer Cellini told Yohannan that he (Cellini) "had to speak with his boss in Springfield before he could render a decision." Pl.'s 12(N) ¶ 21; Pl.'s Aff. ¶ 34. Yohannan's averment stands undisputed by the defendants, and this sort of non-public consultation is not the sort of judicial-type or administrative law judge-like independence required to characterize the state agency's process as "judicial." Indeed, the defendants label the Director of Central Management Services as the "final decisionmaker," Defs.' Reply at 6, but fail to inform us what access, if any, the plaintiff had to a forum in which he could present evidence or argument to the Director.

Additionally, even if we step back to the defendants' first contention that the Step 3 Hearing is the relevant decision for res judicata purposes, Defs.' Br. at 7, the defendants fail to explain the nature of the Hearing in sufficient detail. For example, the defendants do not answer whether the Hearing Officer had the power to subpoena witnesses and evidence or whether the Hearing Officer could authorize discovery, *see Pirela v. Village of North Aurora*, 935 F.2d 909, 914 (7th Cir.1991) (Illinois Administrative Review Act granted Village police board subpoena and discovery powers), or whether Yohannan had an opportunity to submit memoranda of law to the Hearing Officer, *see Reed v. AMAX Coal Co.*, 971 F.2d 1295, 1300 (7th Cir.1992). Indeed, the defendants' arguments leave unclear whether Yohannan could even raise the race discrimination issue; although we know a Civil Service Commission hearing officer could consider such an issue, *see Welch v. Johnson*, 907 F.2d 714, 725–26 (7th Cir.1990),

we also know that the Step 3 Hearing was *in lieu of* a Civil Service Commission appeal. In sum, we cannot resolve the applicability of res judicata on the present record, indicating to us that the parties have not tried this issue by consent. Accordingly, the defense is waived and summary judgment on this basis is inappropriate.

### B. Official and Individual Capacities of Ann Patla

■ Next, the parties attempt to address the scope of the suit as against Defendant Ann Patla, the Director of the Department of Mental Health & Developmental Disabilities. In her official capacity, the suit simply seeks relief against the State of Illinois and is thus limited to injunctive relief. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 2309–10, 105 L.Ed.2d 45 (1989). In addition, the State is subject to suit under both § 1981 and § 1983, although the distinction between the elements of the two statutes is unimportant in this suit. Prior to the Civil Rights Act of 1991, § 1983 was the exclusive cause of action against state actors for violations of the right against nondiscrimination in § 1981. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731, 733, 109 S.Ct. 2702, 2720–21, 2721–22, 105 L.Ed.2d 598 (1989). Section 1981(c) now provides that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c) (emphasis added). Accordingly, a § 1981 cause of action may now be brought against state actors, *see Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir.1996), although the elements of the § 1981 cause of action overlap those of § 1983; both require intentional discrimination and that the challenged governmental action be under color of law, *see id.* at 1215.[3]

---

before the agency. *See Schratzmeier*, 186 Ill.Dec. at 828–29, 617 N.E.2d at 67–68.

**3.** We also reject the defendants' argument that the availability of a Title VII remedy against the State precludes other statutory actions. The case cited by the defendants, *Waid v. Merrill Area Public Schs.*, 91 F.3d 857, 862 (7th Cir.1996), appears to have addressed only whether Title VII

precludes § 1983 actions premised on Title IX, on the Constitution, and *Waid* itself relies on *Lakoski v. James*, 66 F.3d 751 (5th Cir.1995), which recognized the viability of § 1983 claims premised on the Constitution despite the availability of a Title VII remedy, *id.* at 755–56. *See also Trigg v. Fort Wayne Community Schs.*, 766 F.2d 299, 302 (7th Cir.1985). Nor does Title VII preclude a suit under § 1985(3) for conspiracies

■ As for the plaintiff's putative suit against Patla in her individual capacity, we hold that she is not even a party in this suit in her individual capacity. The caption of Yohannan's Complaint expressly names three persons "individually," while naming Patla as Director of the Department. Then, the Complaint alleges, "The Defendants, ANN PATLA, DIRECTOR OF THE ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENT DISABILITIES et al are governmental agencies authorized to do business in the State of Illinois. The Defendants have continuously and do now employ more than five hundred (500) employees...." Compl. ¶ 5. At the same time, the other defendants are described as "individual[s]." *Compare id.* ¶ 5 *with id.* ¶¶ 6–8. Most importantly, the record reflects service or process only upon the Department and individuals Manuel Duran, Jackie Crilly, and Dale Awick. *See* Docket Entries 2–5. Accordingly, this suit does not name Patla in her individual capacity.[4]

### C. Evidence of Discrimination

■ As for the remaining individual defendants, we conclude that there exists no genuine issue of material fact as to whether they subjected Yohannan to intentional race or national origin discrimination. With no direct evidence of discrimination, Yohannan tries to prove a prima facie case of discrimination under *McDonnell Douglas:* (1) he belonged to a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) his employer treated similarly-situated employees outside his classification more favorably. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once a prima facie case is proven by a preponderance of the evidence, a burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason. Once a defendant adequately articu-

lates a legitimate, nondiscriminatory reason for the employment action, the plaintiff must produce evidence from which a reasonable trier of fact could conclude that the articulated reason is a pretext. *See Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1404 (7th Cir.1996). Where the proffered reason represents the same reason for the plaintiff's alleged failure to prove a prima facie case, we may eschew mechanistic devotion to the *McDonnell Douglas* burden-shifting analysis and proceed directly to inquire whether the plaintiff has met his burden of production to show pretext. *See id.; see also Taylor v. Canteen Corp.,* 69 F.3d 773, 780 (7th Cir. 1995).

In the instant action, the defendants maintain that Yohannan's sleeping-on-duty infraction triggered disciplinary action against him. As we explained above, Duran reported what he perceived as a sleeping-on-duty violation. Defs.' 12(M) ¶ 12. Crilly and Awick claim that, when considering what sanction to impose, they considered Yohannan's prior disciplinary record, including the first sleeping on duty offense, and the particular danger posed by sleeping on duty during the third shift, when staffing is minimal. *Id.* ¶¶ 15–16. In order to show that the defendants' articulated reason for the discharge is pretextual, Yohannan points to evidence that he claims shows similarly situated Kiley employees who were not disciplined as harshly for second sleeping-on-duty offenses. To that end, the plaintiff relies upon a chart, compiled by Kiley's current Labor Relations Administrator, showing the discipline imposed upon Kiley employees with at least two sleeping-on-duty offenses (all of whom were not Asian–American). Pl.'s 12(N), Ex. R; Defs.' 12(M), App. F. Four of the seven employees were discharged, but the plaintiff argues that three of the four actually were not discharged until at least their third sleeping-on-duty offense, Pl.'s 12(N) ¶¶ 69–71, although

to deprive an individual of the constitutional right to equal protection. *See id.* at 301 (distinguishing *Great American Federal Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 2351, 60 L.Ed.2d 957 (1979)).

**4.** Even if Patla had been sued in her individual capacity, we would grant summary judgment in

her favor because no reasonable trier of fact could find that, simply because the Step 3 Hearing was conducted by a Department employee pursuant to delegated authority, Patla had sufficient personal involvement to be liable under § 1983 or § 1981. *See* Defs.' 12(M), App. B (Patla Aff. ¶ 4).

the defendants explain why certain prior offenses could not or were not considered, Defs.' 12(N)(3)(b) Resp. ¶¶ 69–71. Yohannan also points to the other non-discharged employees as evidence of discrimination, although the defendants supply a variety of reasons to explain why those employees received suspensions rather than discharges, Defs.' 12(N)(3)(b) Resp. ¶¶ 67, 72–73.

Yohannan's reliance on the chart is fatally flawed because he presents no evidence as to *who* actually decided the disciplinary sanctions levied upon the other assertedly similarly-situated employees. *See Timms v. Frank*, 953 F.2d 281, 287 (7th Cir.1992) ("[I]t is difficult ·to say that the difference was more likely than not the result of intentional discrimination when two different decision-makers are involved."). In other words, Yohannan cannot rebut the defendants' articulated reason for his discharge by merely generally pointing to the treatment of other employees at Kiley without linking those decisions to the individual defendants. When pressing claims against the individual defendants, it is meaningless to speak in terms of the non-existent mental state of the "Kiley Mental Health Center"; rather, the plaintiff must show that the individual defendants intentionally discriminated against him.[5] Because the plaintiff fails to establish the defendants, or indeed any individuals, as the

pertinent decisionmakers for the other employees,[6] the defendants' articulated, legitimate nondiscriminatory reason stands unrefuted. Accordingly, we enter summary judgment in their favor.[7]

## IV. Conclusion

For the reasons discussed above, we grant summary judgment for the defendants as to all counts. It is so ordered.

---

5. In any event, none of the plaintiff's evidence casts doubt either on the genuineness of the individual defendants' nondiscriminatory rationales for firing him or the defendants' explanations for suspending some employees rather than discharging them. *E.g.*, Defs.' 12(N)(3)(b) Resp. ¶ 71 (explaining that, when employee committed second offense, prior offense occurred over three years ago, and that the Kiley Facility had in fact requested a discharge after second offense but grievance decision reduced the sanction).

6. Defendant Crilly herself points out that she was the Unit Administrator involved in the disciplinary actions taken against employees Eddie Cozzens and Pamela Walters. Crilly Aff. ¶ 9. For each instance, Crilly explains why those employees were not discharged after their second sleeping-on-duty offense. Cozzens' first offense "occurred in a training setting rather than while performing in a direct care capacity," and thus did not directly endanger patients. *Id.* Yohannan's only response is that "it would seem that, under a non-discriminatory discipline structure, such an offense would be found more serious." Pl.'s 12(N)(3)(b) ¶ 72. That response does not challenge the honesty of Crilly's explanation, but

rather asks us to pass judgment on the wisdom of the defendant's personnel decision. *Cf. McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) ("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions.") (internal quotation omitted). Similarly, Walters's first offense was never formally recorded because a supervisor bungled the disciplinary proceedings, and the supervisor herself was disciplined for that failure. Crilly Aff. ¶ 9. Again, the plaintiff only responds that "[n]on-reporting of offenses by a supervisor is a useful way of meting out discipline in a discriminatory manner." Pl.'s 12(N)(3)(b) ¶ 73. This speculation provides no evidence for a reasonable trier of fact to find against Crilly.

7. We point out that there likewise exists no evidence that could support a finding that it was the Department's custom or policy to discriminate against Asian–Americans, and thus summary judgment is also appropriate on any claim directed against the State.