NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0418n.06

No. 09-3421

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| KATRINA BROWN | ) | **FILED** |
| | ) | **Jul 12, 2010** |
| Plaintiff–Appellant, | ) | LEONARD GREEN, Clerk |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Southern |
| THE OHIO STATE UNIVERSITY; | ) | District of Ohio |
| KAREN HOLBROOK, President, | ) | |
| The Ohio State University in her official capacity, | ) | |
| | ) | |
| Defendants–Appellees. | ) | |

Before:     BOGGS and GILMAN, Circuit Judges; McCALLA, Chief District Judge[*]

PER CURIAM.  Katrina Brown ("Brown") appeals from a judgment of the district court granting summary judgment to the defendants and dismissing with prejudice her claims under 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. §§ 1981 and 1983, and Ohio Revised Code § 4112.99. Brown alleges that, while employed at the Ohio State University Medical Center East ("OSUMC East"), a hospital run by The Ohio State University ("OSU"), she was first demoted, and then terminated, because of her race (African–American).  We adopt the reasoning of the district court's opinion and affirm.

---

[*]The Honorable Jon P. McCalla, United States Chief District Judge for the Western District of Tennessee, sitting by designation.

**I**

Katrina Brown worked in various nursing and managerial positions at The Ohio State University Medical Center from March 1992 until she transferred to The Ohio State University Medical Center East in March 2000. Upon her transfer, Brown initially worked as a staff nurse in OSUMC East's operating room.

In July 2001, Brown was promoted to Associate Director of Perioperative Services. She continued in that role until January 2004, and was responsible for overseeing the daily operations of the operating room, pre-operative and recovery areas, anesthesia, central sterile supply, and endoscopy. Brown also supervised and educated staff, recommended discipline, ordered supplies, and compared costs to a prepared budget.

Brown was considered successful in her new role, leading to a second promotion. In January 2004, she was made Director of Perioperative Services by Jerry Mansfield, a Caucasian who was OSUMC East's Administrative Director of Nursing Services. Brown began reporting directly to Mansfield, and her new job description indicated that she was "responsible for managing the operations, evaluating manager/employee performance, demonstrating customer satisfaction (internal / external) . . . and strategic and operational planning and program development."

Unfortunately, Brown was considerably less successful in the Director position. In August 2004, she received a generally positive performance review from Mansfield, but was told that "areas of concern" included surgeon satisfaction, waiting time, materials management, and orthopedic implant pricing. For her part, Brown testified at her deposition that she believed Mansfield's

concerns reflected his ignorance of either the Perioperative Services unit's functions or Brown's role within that unit.

Evaluating Brown again in August 2005, Mansfield expressed similar reservations about Brown's performance. Mansfield observed that there were indications of dissatisfaction and a lack of teamwork among those working under Brown, and emphasized that she still needed to address some of the issues they discussed in 2004. Specifically, he pointed to Brown's tendency not to "investigate all facts and work to communicate them in a concise manner," which led to "confusing and reactive" interactions with hospital administrators, her subordinates, and surgeons utilizing the hospital's facilities. Mansfield further indicated that he believed that Brown needed improvement in "defensiveness, communication regarding staffing effectiveness, timely decision-making, and priority setting."

Despite their collaboration on an "action plan" that was designed to address the issues identified in Brown's August 2005 evaluation, Mansfield continued to have doubts about Brown's ability to perform in the Director position. On December 1, 2005, he reviewed the action plan in a memo to Brown's personnel file and concluded that some of Brown's goals had not been met, including goals pertaining to the percentage of cases starting late, the number of case cancellations, and the quality of operating room care. At about the same time, Mansfield's notes reflect that (1) Brown unnecessarily delayed ordering a new product that a doctor wanted to use because she mistakenly believed that the request had to be approved by the hospital's product evaluation committee; (2) a different request from two other doctors for a new product was not responded to in a timely manner; and (3) a blade was left in a patient after surgery due to a count error, and Brown did not notify the risk management office of the incident immediately.

Mansfield met with Brown on December 15, 2005, and told her that she was being demoted to Nurse Manager—effectively the same job that she had performed prior to her promotion to Director.

Thereafter, the Director of Perioperative Services position was vacant until the first week of June 2006. In that period, Mansfield's notes documented one instance in February 2006, in which a procedure scheduled by a physician who was using OSUMC East for the first time had to be cancelled because a member of Brown's staff had failed to request necessary equipment. According to the notes, Brown initially blamed one staffer, but Mansfield's investigation disclosed that the person blamed by Brown had never been given the request, and the blame belonged with a different staffer. Mansfield's notes from that period also indicate that Brown was involved in a conflict with other university employees over the use of a storage facility, causing one witness to describe her as "loud, argumentative, and upset."

Brown's permanent replacement as Director of Perioperative Services, Denise Minor, started at OSUMC East during the week of June 5, 2006. After Minor's initial meetings, interactions, and emails with the employees she directly supervised, including Brown, she told Mansfield that she had concerns with Brown's management style and that Brown "seemed to lack ownership of issues in the operating room." Minor was particularly concerned that, unlike the other nurse managers, Brown could not articulate a plan for her department. Minor and Mansfield agreed that Minor should continue her assessment of Brown's performance against the expectations of the Nurse Manager role.

Minor testified in her deposition that, over the next few weeks, she observed Brown's interaction with her staff and attempted to engage Brown in discussions of strategy as it pertained to the operating room, but was unimpressed by Brown's demeanor or her ability to manage. In

particular, Minor noted that Brown's communication style with her subordinates was confrontational, and that Brown was passive and detached when asked her opinion on changes in the perioperative department; when Minor sought to discuss the issues raised in Brown's August 2005 evaluation, Brown appeared to believe that they were irrelevant. When Minor attempted to discuss other issues or problems affecting the operating room, Brown did not take notes or write down the matters that Minor asked her to follow through on, sat with her arms folded, did not make eye contact, and spoke little. Mansfield and Minor decided they would meet with Brown to advise her that they "would be at the point of terminat[ing]" her, but nevertheless offer her an additional chance to help develop and meet "clear expectations."

On June 21, 2006, Minor and Mansfield met with Brown to discuss their concerns with Brown's performance as Nurse Manager. During the meeting, Brown expressed a feeling that she had never received support from Mansfield and, according to her deposition testimony, told him that she couldn't "seem to establish a relationship" with him and asked "is it because I'm African–American or what?" Mansfield ended the meeting to contact the hospital's human resources department, and later in the day told Minor to create another action plan for Brown. At 4:00 p.m. on June 21, Brown, Minor and Mansfield met; Minor discussed the goals for the action plan, including "demonstrat[ing] supporting working relationship with senior leadership," "strategic planning and evaluation [of goals]," and demonstrating sound decision making and positive communication. Brown neither took notes nor asked questions. Despite the meeting earlier in the day, and being tasked with creating strategies to achieve the action plan's goals, she later testified that she believed that the action plan was not related to deficiencies in her own performance, but rather to inform Minor of what Brown's job entailed.

Drafts of the new action plan were exchanged. Again, however, Brown appears to have not agreed with the goals of the plan, and complied with Minor's request that she create tactics to achieve them only because she was told to do so, testifying that "I didn't agree with any of [the action plan], but I didn't say anything. Whatever she wanted me to put on paper . . . was okay with me." On July 12-13, meanwhile, Minor was informed of various personnel problems in the operating room, including scheduling issues and missing surgical instruments, which "followed the same trend that was noted in the assessment completed by Jerry Mansfield on 8/2/05."

On July 26, 2006, Mansfield's notes reflect that Brown was involved in a meeting to discuss space allocation in the operating room. As a result of that meeting, Mansfield identified several problems that he believed reflected on the "communication" and "decision making" areas of concern identified in Brown's most recent action plan, including inappropriate handling of surgical instruments and exceeding the departmental budget for replacement surgical instruments. Mansfield's notes indicate that he believed that these problems demonstrated Brown's continued lack of communication, unawareness of the issues, and/or lack of control of her staff. Mansfield appears to have started the formal termination process on that same day.

Brown's last day as Nurse Manager was July 31, 2006. On that day, she met with Minor, Mansfield, and Kent Hess, the interim CEO of OSUMC East, and was presented with a letter that specified the grounds for her termination:

> . . . deterioration of day-to-day decision-making and lack of personal ownership continues to result in untimely completion of assignments, customer complaints, and general lack of control of the operating room/central sterile department and personnel. Based on these facts and the impact of your continued non-performance/behavior upon our operation, we have concluded that this termination is the appropriate employment action.

Brown asked whether she could take another demotion to staff nurse; when she was told that her only other option was to resign (which would allow her to remain eligible for re-hire), she signed a letter of resignation.

After properly exhausting her administrative remedies, Brown's complaint was filed on May 24, 2007. It contained two counts: (1) that her demotion and termination were based on her race, in violation of 42 U.S.C. § 2000e et seq. and Ohio Revised Code § 4112.99, and (2) that the same race-based demotion and termination were in violation of 42 U.S.C. § 1981. OSU moved for summary judgment on September 30, 2008; its motion was granted and judgment in its favor entered on March 23, 2009. *Brown v. Ohio State Univ.*, 616 F. Supp. 2d 740 (S.D. Ohio 2009). This timely appeal followed.

## II

This court reviews a district court's grant of summary judgment de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). As such, we will uphold such a grant "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Having throughly reviewed the record, we adopt the reasoning and analysis of the district court below with respect to Katrina Brown's claims of discrimination under Title VII and 42 U.S.C. §§ 1981 and 1983.[1] Although Brown has met her burden of establishing a prima facie case under the

---

[1]Liability under 42 U.S.C. § 1983 is coterminous with liability under Title VII when a plaintiff alleges disparate treatment by a state employer. *Grano v. Dep't of Dev. of Columbus*, 637 F.2d 1073, 1082 (6th Cir. 1980). Section 1983 further comprises the exclusive remedy for violation of the rights guaranteed in 42 U.S.C. § 1981. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731–32 (1989). Therefore, Brown's other federal claims are disposed of *en suite* with her Title VII claim. Brown's

standard enunciated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), she has offered no evidence to suggest that the legitimate non-discriminatory reasons proffered by the appellee for its adverse employment decisions with respect to her are, in fact, pretexts for race discrimination.

Brown protests that some objective measurements of her performance indicate that she was succeeding, but such an argument does nothing to address the reasons actually advanced for her demotion and termination, which were grounded in her attitude, communication style, decision-making and leadership skills, and in her lack of responsiveness to her supervisors' concerns about these shortcomings. While Brown also argues that she was treated differently in this regard than her Caucasian coworkers, we agree with the district court that, in contrast to Brown's performance as Director, her predecessor and successor in that position were perceived by hospital administration as "both recogniz[ing] what their job duties as director entailed and proactively work[ing] to improve areas of the department." Similarly, the district court observed, and we agree, that Brown had failed to show that the Caucasian Nurse Managers she worked with responded to problems identified by their supervisors in the same manner that she did.

Therefore, for the reasons identified in the district court's opinion, we **AFFIRM** the judgment of the district court.

---

state law claims, which have never been argued separately by her, are waived on appeal to the extent they may present issues different from those presented by her federal claims. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations and quotation marks omitted).