NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1749
_____

KENYOCK WRIGHT,
Appellant

v.

CITY OF PHILADELPHIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-13-cv-05589)
District Judge: Honorable Anita B. Brody

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 31, 2016

Before: HARDIMAN and SCIRICA, *Circuit Judges*, and
ROSENTHAL,[*] *District Judge*.

(Filed: April 18, 2017)
_____

OPINION[**]
_____

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SCIRICA, *Circuit Judge*

The principal issue presented on appeal is whether the District Court properly granted summary judgment in a civil rights claim under 42 U.S.C. § 1983 against the City of Philadelphia on the basis of municipal liability. We will affirm.[1]

I.

Wright is a paraplegic permanently confined to a wheelchair who alleged he suffered several injuries as the result of a July 6, 2011, encounter with certain Philadelphia police officers. Officers Arvan Thompson and Christopher Toman were on bicycle patrol in Philadelphia's 22nd District when they came across Wright near the corner of 13th Street and Huntingdon Avenue. To the corner's south is a set of steps known to the officers as a popular place for drug use, and they "thought [Wright] was using drugs." App. Vol. II at 64a. When questioned, Wright refused to give his name. In order to identify Wright, the officers detained him and called for a police wagon to take him to the nearby district headquarters. Two other police officers, Officers Kevin Clark and Raymond Crespo, arrived in a police van to transport Wright to district

---

[1] The District Court had jurisdiction over Wright's claim under 28 U.S.C. §§ 1331 and 1441. We have appellate jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary. *Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014). A moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view evidence in favor of the nonmoving party and extend all reasonable favorable inferences to that party. *Scott v. Harris*, 550 U.S 372, 378 (2007). "We review a district court's determinations concerning the admissibility of evidence for an abuse of discretion." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

headquarters.  Wright alleged he was "flipped . . . out of his wheelchair" onto the ground and "handcuffed . . . and dragged . . . into the police wagon."  App. Vol. II at 23a. Wright alleged he was not returned to his wheelchair until after he arrived at headquarters.  There, Wright was identified and released without being arrested or criminally charged.[2]

Wright alleged the detention, handcuffing, and transportation left him with a number of injuries, including "[a] laceration to his right hand, chronic pain to the right wrist, lumbosacral sprain and strain, injuries to his shoulder and entire right side of body," App. Vol. II at 24a, for which Wright sought medical care the next day.

## II.

Wright filed a complaint against the City of Philadelphia in the Philadelphia Court of Common Pleas for assault and false imprisonment, which he claimed amounted to

---

[2] In response to interrogatories, Officer Thompson recited the following sequence of events:

> We (PO Thompson and PO Toman) were riding bikes and saw (the person later identified as Kenyock Wright) in front of a vehicle messing with something in his hand. In the area he was discovered by us, there is a set of steps more near the corner of 13th and Cumberland. It is an area where people are known to use drugs. With that knowledge and Kenyock's behavior near the vehicle, we thought he was using drugs. So we stopped him for possible drug violation. He had a napkin or paper towel in his hands with some drug paraphernalia—straight, scratch pad, but it was a very small amount. When we asked for his name, he started talking about being a Moor and that he did not have to answer to the police because he had sovereignty. He refused to give us his name so we had him taken to headquarters for the purpose of identification. He was not locked up. He was released after identifying him. He was never arrested, just detained and released.

App. Vol. II at 64a.

3

constitutional violations actionable under 42 U.S.C. § 1983.[3] The City removed the action to the United States District Court for the Eastern District of Pennsylvania.

Wright's complaint is not entirely clear on the details of his constitutional claims, but the District Court treated his charges of assault and false imprisonment as alleging excessive force in violation of the Fourth Amendment. As noted, Wright named only the City as defendant, not the individual officers. Under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), § 1983 plaintiffs may recover against cities for their employees' constitutional torts if the violations can be attributed to the city itself—that is, a plaintiff must show that the violation was caused by city policy or custom or by a failure to train city employees amounting to deliberate indifference to constituents' constitutional rights, *see City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Wright alleged the City caused him a constitutional deprivation through its "customs, policies, and practices." App. Vol. II at 25a. He also alleged the City "systematically fail[ed] to properly train, supervise, and discipline police officers" so that they would avoid violating citizens' constitutional rights. App. Vol. II at 26a.

During discovery, the City produced, among other things, the materials and curricula for state- and city-required police training. According to those materials, the

---

[3] Wright's complaint included two other causes of action: one under Article 1, § 8 of the Pennsylvania Constitution, which Wright withdrew; and claims for assault and false imprisonment in violation of "the Laws of . . . the Commonwealth of Pennsylvania," App. Vol. II at 25a, which the District Court treated as state common-law torts. Pennsylvania's Political Subdivision Tort Claims Act provides that cities are liable for certain acts of employee negligence, but not for employees' intentional torts. *See* 42 Pa. Stat. Ann. §§ 8541, 8542(a). Concluding that Wright's state-law claims alleged only intentional torts, the District Court granted summary judgment for the City, which Wright does not appeal.

4

training regimen instructs officers on recognizing special-needs residents and on providing them required accommodations. Specifically, the training materials include a section on "Recognizing Special Needs." App. Vol. I at 120a, 128a. That section contains a number of slides and instructions on accommodating special-needs and disabled residents with whom officers might come into contact. *See, e.g.*, App. Vol. II at 120a ("Recruits will recognize that people with disabilities may require additional services or equipment in order to ensure fair and reasonably equal treatment."); App. Vol. II at 129a (cautioning recruits when encountering individuals who are "impair[ed]," which "can be due to a physical or mental condition"). The training materials also include instruction on the proper use of force.

The City also produced Commissioner's Memorandum 14-01, which then-Commissioner Charles Ramsey issued in February 2014, regarding "Transportation of Disabled Prisoners." *See* App. Vol. II at 106a–110a. That document details guidelines for transporting disabled prisoners and arrestees using the Police Department's Prisoner Disabled-Accessible Van (PDAV).

After discovery, the City moved for summary judgment. Pointing to Memorandum 14-01, Wright argued the City caused his alleged constitutional deprivations because, at the time of his detention, there was no detailed policy like the one in Memorandum 14-01. The trial court concluded Memorandum 14-01 was evidence of a subsequent remedial measure barred by Federal Rule of Evidence 407 from being considered as proof of culpable conduct—that is, as "pro[of] that the City was deliberately indifferent for failing to enact a policy sooner." App. Vol. I at 7a. The trial

5

court held Wright failed to establish a genuine issue of material fact as to whether the City failed to adequately train its officers.

On appeal, Wright challenges the court's decision not to consider Memorandum 14-01 and its grant of summary judgment for the City.

III.

42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

In certain cases, plaintiffs may recover against a city government for a deprivation of constitutional rights, but must show the deprivation can be attributed to the city itself. *Monell*, 436 U.S. at 691; *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Langford v. City of Atlantic City*, 235 F.3d 845, 848 (3d Cir. 2000) ("[A] municipality is liable for 'acts which the municipality has officially sanctioned or ordered.'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). That is, § 1983 does not subject a city to liability solely because its employee violates a citizen's constitutional rights. *See Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) ("A government entity may not be held liable under section 1983 under the respondeat superior doctrine."). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

6

said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

A plaintiff can attribute a constitutional tort to the city itself by showing the injury was caused by city policy, by city custom, or by policymaking officials' deliberate indifference to constituents' constitutional rights. *See Canton*, 489 U.S. at 389. "Policy is made when a 'decisionmaker [with] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews*, 895 F.2d at 1480 (alteration in *Andrews*) (quoting *Pembaur*, 475 U.S. at 481); *see, e.g.*, *Pembaur*, 475 U.S. at 485 (holding city liable when county prosecutor instructed deputy sheriffs to forcibly enter a doctor's office and effect an arrest).

"Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Andrews*, 895 F.2d at 1480). Custom stems from policymakers' "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see Fletcher v. O'Donnell*, 867 F.2d 791, 793–94 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence.").

Deliberate indifference stems from government inaction, namely a city's failure to train its employees on avoiding constitutional violations. If a city fails to train certain employees on their duty to avoid violating citizens' rights, the oversight may "amount[] to deliberate indifference to the rights of persons with whom [city employees] come into

7

contact." *Canton*, 489 U.S. at 388. To show the deliberate indifference required for a "failure to train" claim, a § 1983 plaintiff must show "a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). City policymakers' indifference may stem from a failure to act despite notice city employees continually violate citizens' rights. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. Ordinarily, this requires "[a] pattern of similar constitutional violations by untrained employees." *Id.* at 62.

In some cases, however, a single constitutional violation may amount to deliberate indifference. *See Canton*, 489 U.S. at 390 & n.10. "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. The Supreme Court hypothesized policymakers would be deliberately indifferent to citizens' rights if they "kn[ew] to a moral certainty" armed officers would have to arrest fleeing felons but failed to train those officers on the constitutional limitations on the use of deadly force. *Id.* at 390 n.10. In such circumstances, the need for deadly-force training is "so obvious" that failing to provide it would constitute deliberate indifference on policymakers' parts. *Id.* In such

8

circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible." *Id.* at 390.

But such oversights will only amount to deliberate indifference in a "narrow range of circumstances." *Bryan Cty.*, 520 U.S. at 409. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392. When evaluating the city's decisions, federal courts should be wary of "engag[ing] . . . in an endless exercise of second-guessing municipal employee-training programs." *Id.*

IV.

Wright contends the District Court erred when it concluded there was no genuine issue of material fact as to whether the City was liable under 42 U.S.C. § 1983 for his alleged constitutional deprivations. He suggests the evidence shows deliberate indifference to his rights based on the City's policies, customs, and practices, and based on a failure to train police officers on transporting and detaining disabled individuals. But nothing in the record shows a City policy caused Wright's injuries. Wright points to no decisionmaker with policymaking authority or "official proclamation, policy, or edict," *Andrews*, 895 F.2d at 1480, instructing officers to treat Wright in a way that caused his rights to be violated. Nor does Wright provide evidence of a policymaker's "acquiescence in a longstanding practice or custom," *Jett*, 491 U.S. at 737, of treating disabled citizens in a way that would violate their constitutional rights.

9

Wright contends the City failed to train its officers on the transportation and detention of the disabled, but nothing in the record suggests a deliberately indifferent failure on the City's part. Nothing in the record shows "a municipal actor disregarded a known or obvious consequence," *Bryan Cty.*, 520 U.S. at 410, of the police environment at the time of Wright's arrest. There is no evidence policymakers were on notice that a training oversight was causing officers to violate disabled individuals' rights. *See Connick*, 563 U.S. at 61. And there is no evidence of a pattern of untrained officers committing such violations. *See id.* at 62 (explaining that notice of a training oversight ordinarily requires "[a] pattern of similar constitutional violations by untrained employees").

Nor does the evidence show Wright's case was an "obvious" one in which a single incident may give rise to failure-to-train liability. No evidence indicates a need for more or different training to avoid violating rights of the disabled—particularly not a need "so obvious," *Canton*, 489 U.S. at 390, that City policymakers were deliberately indifferent to disabled individuals' constitutional rights. In fact, the only training evidence in the record indicates otherwise. Discovery yielded training materials that include a section on "Recognizing Special Needs." App. Vol. II at 120a, 128a. That section instructs officers on recognizing individuals' disabilities and special needs, and it informs officers of those individuals' required accommodations. *See* App. Vol. II at 120a ("Recruits will recognize that people with disabilities may require additional services or equipment in order to ensure fair and reasonably equal treatment."); App. Vol. II at 129a (cautioning

10

recruits that they may encounter individuals who are "impair[ed]," which "can be due to a physical or mental condition").

Nor is there evidence that the City's disability-accommodation training falls within the "narrow range of circumstances," *Bryan Cty.*, 520 U.S. at 409, in which training oversights amount to deliberate indifference, *see Canton*, 489 U.S. at 392 ("In virtually every . . . § 1983 [case, the] plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

As noted, Wright contends Memorandum 14-01 is evidence of the City's failure to train. That document—issued in February 2014, three years after Wright's 2011 incident—includes a more-detailed policy on transporting disabled prisoners and arrestees in a special vehicle for the disabled. At the summary judgment stage, courts only consider material that would be admissible at trial. Fed. R. Civ. P. 56(c); *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 262 (3d Cir. 2012) ("Affidavits and declarations considered on summary judgment must, 'set out facts that would be admissible in evidence.'" (quoting Fed. R. Civ. P. 56(c))); *Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948 (9th Cir. 2012); *see* 10B Charles A. Wright, Arthur R. Miller et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017) ("Rule 56 imposes an affirmative duty on each party to show that the material presented in support of or in opposition to the motion would be admissible at trial."). The District Court declined to consider the Memorandum because Rule 407 rendered the document inadmissible insofar as it was "pro[of] that the City was deliberately indifferent for failing to enact a policy sooner." App. Vol. I at 7a.

11

Rule 407 provides that "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct." Fed. R. Evid. 407.[4] But the Rule explains subsequent remedial measures are admissible for other purposes, "such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures." *Id.* The Committee Notes elaborate on these other purposes and add such evidence is admissible to show "existence of duty."[5]

Wright contends the trial court erred in failing to consider the Memorandum because the document was admissible as a Rule 407 exception to show the existence of a duty and the feasibility of precautionary measures. Wright invokes that exception to assert "there was a lack of affirmative policies or procedures to guide officers" on disabled prisoners' needs. Br. of Appellant at 13. Wright adds that the City was

---

[4] In its entirety, Rule 407 reads:

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.

[5] *See* Fed. R. Evid. 407 advisory committee's note ("Exclusion is called for only when the evidence of subsequent remedial measures is offered as proof of negligence or culpable conduct. In effect it rejects the suggested inference that fault is admitted. Other purposes are, however, allowable, including ownership or control, existence of duty, and feasibility of precautionary measures, if controverted, and impeachment.").

12

deliberately indifferent because the Memorandum shows the City "was aware of the existence of a duty to disabled individuals and clearly precautionary measures were feasible." Br. of Appellant at 14.

We do not believe the trial court abused its discretion in ruling that the Memorandum was evidence of subsequent remedial measures and in declining to consider the Memorandum as evidence of culpable conduct. But even were it considered for the reasons Wright offers, that would not ameliorate the evidentiary inadequacy of Wright's § 1983 claim. The issue of duty is uncontroverted. Clearly the City had a duty not to violate Wright's constitutional rights. Nor is precautionary measures' feasibility an issue. The City has not asserted that avoiding a rights violation was not feasible. Rather, Wright bore the burden of producing evidence of a pattern of constitutional violations or evidence the City's existing disability-accommodation training was obviously inadequate. Because the record lacks such evidence, we find no error in the District Court's grant of summary judgment for the City.

V.

Wright's claim, if true, raises serious and troubling allegations of injuries suffered at the hands of certain police officers. And a § 1983 claim against the City of Philadelphia itself may not have been Wright's only available legal remedy. But Wright has not produced evidence that his alleged constitutional wrongs are attributable to the City of Philadelphia. Therefore, we will affirm the District Court's grant of summary judgment for the City.